UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**'08 CIV 5655**

---------------------------------------------

Wachovia Bank, National Association and
Wachovia Capital Markets LLC,

                    Plaintiffs,

           -against-

VCG Special Opportunities Master Fund, Ltd.
(f.k.a. CDO Plus Master Fund Ltd.),

                    Defendant.

08 CV _____

RECEIVED
JUN 23 2008
U.S.D.C. S.D.N.Y.
CASHIERS

---------------------------------------------

## COMPLAINT

       Plaintiffs Wachovia Bank, National Association ("Wachovia") and Wachovia Capital

Markets, LLC ("WCM"), by and through their undersigned counsel, Hunton & Williams LLP,

for their Complaint against defendant VCG Special Opportunities Master Fund, Ltd. (f.k.a. CDO

Plus Master Fund Ltd.) ("CDO Plus"), states as follows:

### Nature of the Action

      1.    Plaintiffs bring this action to enjoin arbitration initiated by Defendant before the

Financial Industry Regulatory Authority ("FINRA") and captioned *VCG Special Opportunities*

*Master Fund LTD. f/k/a CDO Plus Master Fund LTD. v. Wachovia Capital Markets, LLC,*

FINRA Dispute Resolution Number 08-01420 (the "FINRA Arbitration"), because (i) it is

duplicative of a civil action brought by Defendant pending before this Court (the 'SDNY

Action"); and (ii) Defendant is not a customer of Wachovia Capital Markets, and therefore, may

not initiate arbitration.

2.     Both the SDNY Action and the FINRA Arbitration arise out of the same transaction -- a credit default swap transaction between CDO Plus and Wachovia Capital Markets's affiliate, Wachovia Bank (the "CDS Trade").[1]

3.     This SDNY Action, captioned *CDO Plus Master Fund Ltd. v. Wachovia Bank, National Association*, No. 07 CV 11078, was originally filed on November 28, 2007, and, after removal from New York State Supreme Court, was assigned to the Honorable Laura Taylor Swain.  The SDNY Action has been proceeding for nearly seven months.  The parties are presently engaged in fact discovery, which is scheduled to close on September 30, 2008.  The Parties also are preparing for a settlement conference set by Magistrate Judge Peck for July 24, 2008.

4.     Defendant's attempt to initiate the FINRA Arbitration, therefore, represents a brazen attempt to:  (i) burden Wachovia with the duplicative expense of defending the same claims simultaneously in two jurisdictions, (ii) interfere with Judge Swain's and Magistrate Judge Peck's ability to fully adjudicate the claims before this Court, and (iii) obtain a "second-bite-at-the-apple", setting the stage for potentially conflicting judgments and ensuring a needless waste of resources.[2]

5.     Moreover, Defendant was not a customer of WCM when it entered into the CDS Trade.  As such, Defendant has no right to initiate a FINRA arbitration against WCM and should be enjoined permanently from initiating such a proceeding.

---

[1] Wachovia Capital Markets LLC and Wachovia Bank, National Association are wholly owned subsidiaries of Wachovia Corporation, which is traded on the New York Stock Exchange under the trading symbol "WB".

[2] Because the underlying facts at issue in this case and the SDNY Litigation are the same, Plaintiffs will request that this case be joined with the SDNY Litigation as a related case.

## Parties

6.      Plaintiff Wachovia Bank, National Association is a national banking association and a wholly owned subsidiary of Wachovia Corporation.  Wachovia Bank, National Association has its principal place of business located at 301 South College Street, Charlotte, North Carolina.

7.      Plaintiff Wachovia Capital Markets, LLC is also a wholly owned subsidiary of Wachovia Corporation, which provides debt and equity underwriting, trading, research and sales, loan syndications agent services, and corporate finance and M&A advisory services to its customers.  WCM is a registered broker dealer and member of FINRA.

8.      Defendant CDO Plus is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

9.      CDO Plus was incorporated in Jersey on June 13, 2006.  Effective November 21, 2007, CDO Plus changed its name to VCG Special Opportunities Master Fund Limited.

10.      CDO Plus is a hedge fund with $58 million in assets under management, whose managers have extensive experience investing in complex financial instruments, including collateralized debt obligations and credit derivative transactions.

## Jurisdiction and Venue

11.      This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs.

12.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).

## Substantive Allegations

<u>WACHOVIA AND CDO PLUS ENTER INTO THE DERIVATIVE SWAP TRANSACTION</u>

13.    In the spring of 2007, Defendant approached representatives of Wachovia and WCM and sought to enter into a derivative swap transaction worth $10 million.

14.    In May 2007, CDO Plus entered into a Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "CDS Trade" or "Agreement") with Wachovia.  The Agreement is comprised of documents filed as Docket Number 20 in *CDO Plus Master Fund LTD v. Wachovia Bank, National Association*, United States District Court, Southern District of New York, Docket No. 07 CV 11078 (LTS)(AJP) (hereinafter referred to as "SDNY Dkt. _"), and is incorporated herein by reference.

15.    In the course of negotiating the CDS Trade, representatives from CDO Plus spoke with representatives of both Wachovia and WCM.

16.    CDO Plus, however, is not a customer of WCM and has never entered into any agreement that would compel WCM to arbitrate any dispute between the parties.[3]

17.    Under the terms of the written Agreement, CDO Plus would receive periodic payments over the term of the derivative instrument (in this case, a credit default swap).  If, however, certain events (including events of default) occurred, CDO Plus would be required to make payments to Wachovia.

18.    As security against the risk that CDO Plus would be unable to meet its obligations to make payments, Wachovia was allowed to, and did, demand that CDO Plus provide Wachovia with collateral.  Over the life of the Transaction, the sum of collateral that Wachovia was

---

[3] Defendant's investment advisor rekon advisors llc was, at one time, a customer of WCM.  Rekon advisors llc (n.k.a. Vanquish Advisors), however, is not a party to either the SDNY Action or the FINRA Arbitration.

allowed to demand and hold was an independent amount equal to $750,000 paid initially, plus an additional amount that fluctuated depending upon changes in the replacement cost of the credit derivative swap.

19.     Over the summer and fall of 2007, the market value of a credit derivative swap transaction similar to the transaction between CDO Plus and Wachovia (*i.e.*, Wachovia's replacement cost) increased dramatically. Under the terms of the CDS Trade, Wachovia was therefore entitled to demand additional amounts of collateral from CDO Plus. Until the last such demand was made, CDO Plus met its obligations under the Agreement, and, by November 2, 2007, had transferred $8.92 million of collateral to Wachovia.

CDO PLUS BREACHES THE AGREEMENT AND FILES A CIVIL ACTION AGAINST WACHOVIA

20.     Beginning in November 2007, CDO Plus breached the Agreement by, among other things, refusing to transfer collateral to Wachovia, which was required under the written terms of the CDS Trade.

21.     Then, on November 28, 2007, in an effort to avoid its contractual obligations to Wachovia, CDO Plus filed a lawsuit against Wachovia in New York State Supreme Court. CDO Plus's original verified complaint can be found at SDNY Dkt. 1, and is incorporated herein by reference.

22.     Wachovia removed the case to the United States District Court for the Southern District of New York on December 7, 2007. The case, *CDO Plus Master Fund LTD v. Wachovia Bank, National Association* was assigned the docket number 07 CV 11078 and assigned to the Honorable Laura Taylor Swain.

23.     On January 15, 2008, CDO Plus filed an Amended Complaint. Attached hereto as Exhibit 1 is a true and correct copy of CDO Plus's Amended Complaint.

24. In its Amended Complaint, CDO Plus alleges claims for fraud, mistake, breach of contract, breach of implied covenant of good faith, unjust enrichment, specific performance, and conversion.

25. On February 15, 2008, Wachovia answered CDO Plus's Complaint and brought a single counterclaim for breach of contract. Attached hereto as Exhibit 2 is a true and correct copy of Wachovia's Answer and Counterclaim.

26. The parties to the SDNY Action have exchanged initial disclosures, pursuant to Fed. R. Civ. P. 26.

27. On March 10, 2008, Judge Swain entered a scheduling order (*see* SDNY Dkt. 18) in the SDNY Action.

28. Fact discovery is scheduled to be completed by September 30, 2008. The parties to the SDNY Action have engaged in extensive fact discovery, including the exchange of written discovery demands, document production, scheduling depositions, and taking deposition testimony.

29. The parties to the SDNY Action are also preparing for a settlement conference set by Magistrate Judge Peck for July 24, 2007.

THE FINRA ARBITRATION

30. On or after May 8, 2008, WCM received from FINRA a Dispute Resolution Statement of Claim. Attached hereto as Exhibit 3 is a true and correct copy of CDO Plus's Statement of Claim.

31. Defendant's Statement of Claim alleges that WCM is liable to CDO Plus for violations of FINRA Conduct Rules, breach of fiduciary duties, negligence, negligent supervision, violations of customer agreements, violations of the implied covenant of good faith

and fair dealing, fraud, constructive fraud, "and any other legal theories under federal and state law . . . that may be applicable to the facts."

32.    The claims are based upon the same set of facts alleged in CDO Plus's January 15, 2008 Amended Complaint in the SDNY Action.

33.    WCM's response to CDO Plus's Statement of Claim is due on June 27, 2008.

34.    Defendant's claims in both the SDNY Action and the FINRA Arbitration arise out of the same transaction – the CDS Trade between Defendant and Wachovia Bank.

## FIRST CAUSE OF ACTION
### (Permanent Injunction, pursuant to 28 U.S.C. § 1651)

35.    Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

36.    Pursuant to 28 U.S.C. § 1651, Plaintiffs seek an order of this Court enjoining CDO Plus's initiation of arbitration based upon the same claims at issue in the SDNY Action.

37.    Defendant's attempt to initiate the FINRA Arbitration constitutes, among other things, an effort to frustrate this Court's administration of the claims before it, as well as an attempt to thwart the Court's orders entered in this case, including Judge Swain's March 10, 2008 Pre-Trial Scheduling Order, and Magistrate Judge Peck's May 1, 2008 Order for Settlement Conference, as modified at the June 9, 2008 scheduling conference. Plaintiffs' FINRA Arbitration sets the stage for conflicting judgments and a needless wasting of resources.

38.    Injunctive relief is appropriate because it is necessary and appropriate in aid of this Court's jurisdiction over the claims asserted in the SDNY Action.

## SECOND CAUSE OF ACTION
### (Declaratory Judgment)

39.    Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

40.    Pursuant to 28 U.S.C. § 2201(a), Plaintiffs seek a declaration of this Court that: (1) CDO Plus has no right to initiate a FINRA arbitration against WCM because no arbitration agreement exists and CDO Plus is not a customer of WCM; and (2) WCM owes no duty to CDO Plus, fiduciary or otherwise, based upon the CDS Transaction that is at issue in the SDNY Action.

41.    Declaratory relief is appropriate because there is an actual justiciable controversy between the parties of sufficient immediacy to justify the relief sought.

WHEREFORE, Plaintiffs respectfully request that the Court enter a judgment:

(i)    declaring that CDO Plus may not initiate a FINRA arbitration against WCM;

(ii)    declaring that WCM owes not duty to CDO Plus based upon the Transaction at issue in the SDNY Litigation.

(ii)    declaring that CDO Plus's arbitration demand is permanently enjoined; and

(iii)    awarding Plaintiffs all costs associated with bringing this action, including, but not limited to, attorneys' fees; and

(iii)    such other and further relief as the Court may deem proper.


Date:   New York, New York
        June 23, 2008

HUNTON & WILLIAMS LLP

By: _____

Shawn Patrick Regan
200 Park Avenue, 52nd Floor
New York, New York 10166
(212) 309-1000
sregan@hunton.com

-and-

Patrick L. Robson
HUNTON & WILLIAMS LLP
Bank of America Plaza
101 S. Tyson Street, Suite 3500
Charlotte, North Carolina 28280
(704) 378-4700
probson@hunton.com

*Attorneys for Plaintiffs*
*Wachovia Bank, National Association and*
*Wachovia Capital Markets LLC*

# Exhibit 1

MINTZ & GOLD LLP
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------X

CDO PLUS MASTER FUND LTD.,     :

                           :    **07 Civ. 11078 (LTS)(AJP)**

            Plaintiff,    :

                           :    **AMENDED COMPLAINT**

    - against -        :

                           :

WACHOVIA BANK,          :    **ECF CASE**
NATIONAL ASSOCIATION,

                           :

            Defendant.    :

-------------------------------------------------------X

## Introduction

1.      This action concerns a classic "bait and switch" by the Defendant,

Wachovia Bank, National Association ("Wachovia"), in which Wachovia fraudulently

induced the Plaintiff, CDO Plus Master Fund Ltd.,[1] to enter into a credit derivative

transaction, or "swap," through the offer of more favorable margin terms than Wachovia

actually intended to honor.  In reliance upon Wachovia's representations, Plaintiff

entered into the trade and deposited $750,000 to collateralize the swap.  Within weeks of

the trade, however, Wachovia demanded unreasonably high amounts of additional margin

---

[1]    On November 21, 2007, the Companies Registry of the Jersey Financial Services Commission
recorded the change of Plaintiff's name to VCG Special Opportunities Master Fund Limited.

even though Plaintiff was not under an obligation to post any collateral at all after depositing the initial margin of $750,000. Under the Confirmation Letter of the swap agreement, after the initial margin deposit Wachovia was entitled to demand payments from Plaintiff *only* upon the occurrence of an actual credit default, *i.e.*, a failure to pay principal, an interest shortfall or a "writedown" in the underlying "reference obligation" (which in this case is an investment-grade collateralized debt obligation, or "CDO"). Perhaps in a panic over recent turmoil in the debt markets connected to the sub-prime mortgage lending crisis, Wachovia purportedly determined (but without any reasonable basis) that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated in the scant weeks that had passed since it entered into the credit default swap with the Plaintiff.

2.        In the alternative, if Wachovia had not planned to deceive Plaintiff regarding the amount of collateral it intended to extract in order to protect itself against counterparty risk, then there was no meeting of the minds regarding the subject matter of the transaction. Relying upon the terms of the Confirmation Letter governing the swap, Plaintiff entered into the transaction with the understanding that it was selling risk protection *against a credit default only*. Wachovia knew or should have known this fact but, in retrospect, sought to hold Plaintiff to a different set of obligations, such as a market value swap, *i.e.*, a transaction under which Plaintiff would bear the risk of daily movements in the value of the reference obligation. When Plaintiff confirmed that no credit default had taken place, it refused to pay more money as "margin." After Plaintiff commenced this action (originally in New York Supreme Court), Wachovia closed out the trade and converted all the money that had been deposited to date, $8,920,000.

2

3.      Plaintiff seeks rescission of the swap transaction, the return of all sums Plaintiff deposited as collateral or otherwise, damages from the breach and/or specific performance and a permanent injunction against further violations by Wachovia.

## The Parties

4.      Plaintiff is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

5.      Wachovia is a national banking association with its designated main office and principal place of business in Charlotte, North Carolina.

## Jurisdiction and Venue

6.      The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

7.      In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

## Substantive Allegations

### The Credit Default Swap

8.      Plaintiff is a hedge fund with approximately $50,000,000 of funds under management.

9.      On or about May 21, 2007, Plaintiff entered into a credit default swap transaction with Wachovia.

10.     A credit default swap is a contract under which two financial institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this

3

case, a CDO. A credit default swap bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

11.     In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of the Class B tranche of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007-1A, which were issued pursuant to an Indenture dated April 11, 2007.[2]

12.     The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

13.     By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

---

[2]     Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's default risk, the amount of the debt obligation on which the fee is calculated (and for which the seller agrees to undertake credit default exposure in return) is termed the "notional" amount.

<u>Initial Margin and Floating Payments</u>

14.      When Plaintiff and Wachovia executed the swap, Plaintiff paid

Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the

"independent amount." For purposes of clarity, however, this Complaint instead refers to

the deposit of $750,000 as the "initial margin." The purpose of the initial margin was to

secure Wachovia against the credit risk of the counterparty (Plaintiff).

15.      Under the Confirmation Letter, the only payments that Wachovia may

demand from Plaintiff *after* the initial margin are "Floating Payments." Wachovia may

require Floating Payments *only* on the basis of a good faith determination by the

Calculation Agent (which in this case is Wachovia) that a "Floating Amount Event" had

taken place: (i.) the obligor on the reference obligation (the CDO) had failed to make a

required principal or scheduled interest payment or (ii) a writedown had taken place

according to the method prescribed by the reference obligation's governing instrument –

*not* on the basis of the perceived creditworthiness of the counterparty (Plaintiff).

16.      Apart from the initial margin and Floating Payments, the Confirmation

Letter does not otherwise authorize Wachovia to demand payments of any kind to secure

Wachovia against the credit risk of the counterparty or the reference obligation.

17.      On some swaps, margin may be collected after the initial margin. In

such cases, the additional margin is referred to as "variation margin" and is based upon a

downward movement in the mark-to-market value of the underlying obligation.

18.      In or about April 2007, before the parties entered into the swap

agreement, Wachovia had originally demanded initial margin in the amount of

$1,500,000, but Plaintiff informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial margin were reduced to $750,000.

19.    Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those terms, knowing at the time that it would simply contrive later to demand more collateral on the pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once Plaintiff was locked into to the trade. (The CDO matures in 2053).

20.    Plaintiff wired the $750,000 of initial margin to Wachovia's account on or about May 30, 2007.

Wachovia Squeezes Plaintiff for More Money

21.    However, less than three weeks later, Wachovia demanded an additional amount of collateral, requiring a deposit of $320,000 on or about June 18, 2007.  Several days later, Wachovia requested an additional $430,000.  Tellingly, the sum of the initial margin and these two latter deposits comes to a total of $1,500,000 – precisely the amount that Wachovia had wanted in the first instance and that Plaintiff had thought it had bargained down to $750,000.

22.    Nor was Wachovia finished at $1,500,000.  Wachovia continued to ratchet up its demands for variation margin over the weeks that followed:

| Date | Amount |
|---|---|
| May 30, 2007 | $750,000 (initial |
| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |

6

| July 20, 2007 | $740,000 |
|---|---|
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |
| October 30, 2007 | $850,000 |
| November 1, 2007 | $620,000 |

23.      In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a
period of five months purportedly to secure Wachovia against a total credit risk of
$10,000,000 from an investment-grade debt instrument.

24.      However, upon information and belief, during the entire period
described in the table above, and as of the date of the filing of the original Complaint in
this action, the reference obligation (Forge ABS High Grade CDO Ltd, 2007-1A) had not
experienced any shortfall in principal or interest payments whatsoever.

25.      Also upon information and belief, during the same period, no write-
down had taken place according to the reference obligation's controlling documents
resulting in any reduction of the outstanding principal amount of the reference obligation,
nor had any other write-down taken place such that Plaintiff could properly have been
required to make a Floating Payment to Wachovia.  Upon information and belief, from
the date when Wachovia and Plaintiff first entered into the credit default swap, and as of
the date of this Complaint, the reference obligation has at all times been and continues to
be an investment grade debt instrument.

26.        Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia *solely* upon the basis of a report of the servicer of the underlying reference obligation.[3]

27.        At first, Plaintiff delivered the additional collateral requested by Wachovia without protest.  However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over *40%* of the notional amount.

28.        While Plaintiff believed it was not obligated to pay the sums demanded by Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral – which ultimately, Wachovia did.

29.        Wachovia responded that it was entitled to require variation margin pursuant to the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-to-market value of the reference obligation.

30.        Although the overall CDO market had certainly experienced considerable turmoil during the summer of 2007, no credit event had yet occurred such that Plaintiff should have been required to make a Floating Payment.  While one rating agency, Fitch, had downgraded the reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not constitute a credit event within the

---

[3]        Pursuant to the indenture of a collateralized debt obligation, a servicer performs the ministerial task of calculating payment amounts and preparing reports regarding the interest and principal due to be paid on the CDO.

meaning of the swap documents.  No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

31.    Moreover, even if Wachovia had been entitled to demand variation margin, *i.e.*, to secure Wachovia against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Wachovia failed even to make a good faith estimate of the required collateral. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

32.    In such an event, even under Wachovia's interpretation of the swap agreements, Wachovia would have been required to *return* a portion of the collateral to Plaintiff, and certainly not to demand more.  Thus, even assuming that Wachovia faced exposure on the reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of Wachovia's exposure would in every case call for a payment by Plaintiff to Wachovia.

Wachovia Admits that it Breached the Swap Agreement

33.    In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

34.    Wachovia admitted that it had *not* used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

9

35.    Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

36.    Thus, the margin calls had been expressly used by Wachovia not to satisfy Plaintiff's obligation to make a "Floating Payment," or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

37.    As of the date of this Amended Complaint, Plaintiff had delivered $8,920,000 in collateral against the notional amount of $10,000,000.

Wachovia Escalates its Margin Demands

38.    On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

39.    Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

40.    In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

41.    At first, Wachovia did not respond to the November 21 letter.

42.    Instead, on the next business day, which was the day after Thanksgiving, Wachovia sent a new margin call, this time in the amount of $810,000.

43.      Intriguingly, the margin call for November 23, 2007, which demanded $260,000 more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the following Collateral Movement as of Close of Business of 22 November 2007," which was Thanksgiving Day.

44.      As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved.

45.      On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000.

46.      It was not until later in the day that Wachovia finally held a conference call with Plaintiff's principals to attempt a resolution of the dispute.

47.      When asked why Wachovia had suddenly started sending daily margin calls, Wachovia's counsel responded that Wachovia marked the position to market daily (even though Wachovia had never issued daily margin calls to Plaintiff before).

48.      On November 27, 2007, Wachovia sent yet another margin call, this time calling for $1,490,000 of additional collateral, for a total of $10,410,000 – almost half a million dollars *more* than the notional amount of the swap!

49.      Wachovia also sent four market quotations of the swap, expressed in "points upfront," which purported to justify Wachovia's exorbitant margin calls, suggesting that the reference obligation's creditworthiness had deteriorated to the point that it was worth approximately five cents on the dollar.

50.     At the same time, Wachovia finally included a copy of the servicer's report, which revealed that *none* of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

51.     Upon reviewing the servicer's report, Plaintiff was able to confirm that Wachovia had not been collecting "Floating Payments," since no "Floating Amount Event" had taken place.

52.     Moreover, even if Wachovia were entitled to demand margin (as distinguished from Floating Payments), Wachovia had failed to calculated its "exposure" to the credit risk of the reference obligation in good faith.

53.     The creditworthiness of the reference obligation has not been impaired, at least not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

54.     Wachovia had therefore improperly demanded and collected sums that Plaintiff should never have been required to pay. The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO was commercially unreasonable – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

55.     At the same time, it allowed Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

Plaintiff Files the Lawsuit in Supreme Court and
Wachovia Declares an Event of Default

56.     On November 28, 2007, Plaintiff commenced the instant civil action in
the Supreme Court of the State of New York.  On December 7, 2007, Wachovia removed
this action to the United States District Court for the Southern District of New York.

57.     On December 7, 2007, Wachovia sent Plaintiff a Notice of Failure to
Transfer, reciting that "*[a]s of November 28, 2007* and continuing through the date
hereof, Counterparty [*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers
of Eligible Collateral in an amount equal to $1,740,000 to Wachovia as required under
the Credit Support Annex.  Counterparty's failure to Transfer will become an Event of
Default under Paragraph 7(i) of the Credit Support Annex and Section 5(a)(iii)(1) of the
Agreement if the required amount of Eligible Collateral is not delivered to Wachovia on
or before the first Local Business Day after this notice is delivered to you."

58.     Plaintiff declined to pay any further sums to Wachovia.

59.     On or about December 10, 2007, Wachovia sent Plaintiff a Notice of
Event of Default.

60.     On December 13, 2007, Wachovia sent Plaintiff a Notice of Early
Termination, and designated December 18, 2007 as the Early Termination Date.

61.     On December 20, 2007, Wachovia notified Plaintiff that it was closing
out the swap transaction.  Wachovia purported to determine its loss on the transaction as
$9,990,000, based upon quotations for the reference obligation that it had obtained from
market-makers.

62.    Wachovia further stated that a Writedown in the amount of $10,000,000 had occurred with respect to the Reference Obligation. However, no such Writedown had occurred within the meaning of the Confirmation Letter.

Wachovia Converts Plaintiff's Collateral

63.    On or about December 27, 2007, Wachovia notified Plaintiff that it had foreclosed on the $8,920,000 of collateral, and that Plaintiff owed Wachovia the amount of the "deficiency," $1,030,861.12, together with interest and other amounts, including collection costs and legal fees.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(For Rescission - Fraud)**

64.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

65.    Wachovia made numerous false representations to, and concealed material existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure Wachovia against its perceived counterparty risk.

66.    In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

67.    The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

68.    But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia. By reason of the foregoing,

Plaintiff is entitled to rescission of the swap and restitution by Wachovia of all sums paid

by Plaintiff to date, including without limitation the initial margin and all further sums

paid as collateral.

### AS AND FOR A SECOND CAUSE OF ACTION
#### (For Rescission - Mistake)

69.      Plaintiff repeats and realleges the allegations contained above, as if

fully set forth herein.

70.      No meeting of the minds had been achieved at the time that the parties

entered into the swap transaction.  Based upon the Confirmation Letter and the

negotiations leading up to it, Plaintiff had agreed to sell credit protection on a credit

default swap, not to take the risk of daily mark-to-market movements in the value of the

reference obligation.  Wachovia was aware that the Confirmation Letter stipulated only

Floating Payments, not margin based upon daily changes in the creditworthiness of the

Forge CDO, but did not address the discrepancy until after Plaintiff had closed on the

trade in May 2007.  As to Plaintiff, the mistake was honest and excusable, such that

enforcement of the variation margin provision would therefore be unconscionable.

71.      Accordingly, Plaintiff is entitled to an equitable rescission or

reformation of the swap and a return of its collateral.

### AS AND FOR A THIRD CAUSE OF ACTION
#### (For Damages from Wachovia's Fraud)

72.     Plaintiff repeats and realleges the allegations contained above, as if fully

set forth herein.

73.      The misrepresentations and omissions set forth herein were engaged in by

Wachovia with intent to deceive Plaintiff and constitute fraud under principles of

common law entitling Plaintiff to an award of compensatory damages in an amount to be

determined at trial, as well as incidental damages incurred in connection with the

negotiation, execution and consummation of the swap.

### AS AND FOR A FOURTH CAUSE OF ACTION
#### (Breach of Contract)

74.    Plaintiff repeats and realleges the allegations contained above, as if fully

set forth herein.

75.    Plaintiff has performed all of its obligations under the swap agreement.

76.    Wachovia has breached the agreement, *inter alia*, by demanding the

deposit of collateral far in excess of the amount actually required.

77.    Plaintiff has been thereby damaged in an amount to be determined at trial.

### AS AND FOR A FIFTH CAUSE OF ACTION
#### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.    Plaintiff repeats and realleges the allegations contained above, as if fully

set forth herein.

79.    By gradually making oppressive margin demands without justification,

Wachovia acted in a manner so as to deprive Plaintiff of the right to receive the benefit of

the swap agreement, namely, the premium to be paid by Wachovia on the notional

amount at a cost to Plaintiff no greater than the opportunity cost of the collateral actually

required to secure counterparty risk and credit risk.

80.    To the extent that the swap agreement gave Wachovia any discretion as

calculation agent in the determination of the credit risk of the reference obligation, the

implied covenant of good faith and fair dealing included a promise on the part of

Wachovia not to act arbitrarily or irrationally in exercising that discretion.

81.    By extracting collateral from Plaintiff far in excess of what Wachovia

actually required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

16

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

82.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

83.    By extracting an unnecessarily large amount of collateral from Plaintiff, Wachovia received money properly belonging to the Plaintiff.

84.    Wachovia has benefited and is benefiting from the receipt of those funds and, under principles of equity and good conscience, Wachovia should not be permitted to retain such collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (For a Permanent Injunction/Specific Performance)

85.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

86.    Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

87.    If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

88.    The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

89.    The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

17

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Conversion)

90.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

91.    Wachovia intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

92.    The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

93.    Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.

**WHEREFORE,** Plaintiff demands judgment as follows:

A.    On the Third, Fourth, Fifth and Eighth Causes of Action, damages in an amount to be determined at trial, plus interest and costs;

B.    On the First, Second, Sixth and Seventh Causes of Action, restitution of the sums paid by Plaintiff to Wachovia under the swap agreement;

C.    On the First and Second Causes of Action, an equitable rescission of the swap agreement;

D.    On the Seventh Cause of Action, an order directing specific performance of the swap according to the terms of the Confirmation Letter; declaring the obligation to pay variation margin superseded by the terms of the Confirmation Letter; directing restitution of all collateral apart from the initial margin; and permanently enjoining Wachovia from future breaches of the swap agreement;

18

E.     On the First, Second, Third and Eighth Causes of Action, an award of

punitive damages; and

F.     Interest, costs, and such other and further relief as to the Court may seem

proper and equitable, including an award of reasonable attorney's fees.

Dated: New York, New York
       January 12, 2008

                              **MINTZ & GOLD LLP**

_Terence W. McCormick_
Steven G. Mintz (SM 5428)
Terence W. McCormick (TM 2713)
470 Park Avenue South
10th Floor North
New York, NY 10016-6819
Tel: (212) 696-4848
Fax: (212) 696-1231
mintz@mintzandgold.com
mccormick@mintzandgold.com
*Attorneys for Plaintiff*
*VCG Special Opportunities Master Fund Ltd.,*
*(f/k/a CDO Plus Master Fund Ltd.)*

To:    **HUNTON & WILLIAMS LLP**
       Patrick L. Robson, Esq.
       Bank of America Plaza, Suite 3500
       101 South Tryon Street
       Charlotte, North Carolina 28280

       Shawn Patrick Regan, Esq.
       200 Park Avenue
       New York, New York 10166-0091
       *Attorneys for Defendant*
       *Wachovia Bank, N.A.*

19

# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
                                                          :
CDO Plus Master Fund Ltd.,                                :
                                                          :
                         Plaintiff,                       :              07 CV 11078 (LTS)(AJP)
                                                          :                   ECF Case
                 -against-                                :
                                                          :
Wachovia Bank, National Association,                      :
                                                          :
                         Defendant.                       :
------------------------------------------------------------------x

## DEFENDANT WACHOVIA BANK'S
## ANSWER AND COUNTERCLAIM

Defendant Wachovia Bank, National Association ("Wachovia"), by and through its

undersigned counsel, Hunton & Williams LLP, for its Answer to the amended complaint of CDO

Plus Master Fund Ltd., filed January 15, 2008 (the "Complaint"), responds as follows:

### Introduction

1.      This action concerns a classic "bait and switch" by the Defendant, Wachovia
Bank, National Association ("Wachovia"), in which Wachovia fraudulently induced the Plaintiff,
CDO Plus Master Fund Ltd.,[1] to enter into a credit derivative transaction, or "swap," through the
offer of more favorable margin terms than Wachovia actually intended to honor.  In reliance
upon Wachovia's representations, Plaintiff entered into the trade and deposited $750,000 to
collateralize the swap.  Within weeks of the trade, however, Wachovia demanded unreasonably
high amounts of additional margin even though Plaintiff was not under an obligation to post any
collateral at all after depositing the initial margin of $750,000.  Under the Confirmation Letter of
the swap agreement, after the initial margin deposit Wachovia was entitled to demand payments
from Plaintiff *only* upon the occurrence of an actual credit default, *i.e.*, a failure to pay principal,
an interest shortfall or a "writedown" in the underlying "reference obligation" (which in this case
is an investment-grade collateralized debt obligation, or "CDO").  Perhaps in a panic over recent
turmoil in the debt markets connected to the sub-prime mortgage lending crisis, Wachovia

---

[1]     On November 21, 2007, the Companies Registry of the Jersey Financial Services
        Commission recorded the change of Plaintiff's name to VCG Special Opportunities
        Master Fund Limited.

purportedly determined (but without any reasonable basis) that the creditworthiness of the reference obligation (and/or the Plaintiff) had drastically deteriorated in the scant weeks that had passed since it entered into the credit default swap with the Plaintiff.

**ANSWER:**

Wachovia admits that CDO Plus Master Fund Ltd. ("CDO Plus") deposited the Independent Amount, as defined by paragraph 7 of the Confirmation, with Wachovia. Wachovia admits the allegations set forth in footnote 1 of paragraph 1 of the Complaint. Wachovia denies the remaining allegations set forth in paragraph 1 of the Complaint that purport to describe acts by Wachovia. To the extent that Plaintiff purports to characterize the written agreement between the parties, Wachovia refers to the documents for their terms and denies that Plaintiff's characterization of those terms is correct. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 1 of the Complaint.

2.    In the alternative, if Wachovia had not planned to deceive Plaintiff regarding the amount of collateral it intended to extract in order to protect itself against counterparty risk, then there was no meeting of the minds regarding the subject matter of the transaction. Relying upon the terms of the Confirmation Letter governing the swap, Plaintiff entered into the transaction with the understanding that it was selling risk protection *against a credit default only*. Wachovia knew or should have known this fact but, in retrospect, sought to hold Plaintiff to a different set of obligations, such as a market value swap, *i.e.*, a transaction under which Plaintiff would bear the risk of daily movements in the value of the reference obligation. When Plaintiff confirmed that no credit default had taken place, it refused to pay more money as "margin." After Plaintiff commenced this action (originally in New York Supreme Court), Wachovia closed out the trade and converted all the money that had been deposited to date, $8,920,000.

**ANSWER:**

To the extent that the allegations set forth in paragraph 2 of the Complaint assert conclusions of law, no response is required. Wachovia admits that Plaintiff failed to meet its obligation under the Agreement to post collateral with Wachovia. Wachovia admits that as a result of Plaintiff's default, Wachovia caused an early termination of the Agreement, exercised

its right to liquidate the Posted Collateral, and applied the liquidation proceeds to satisfy a

portion of Plaintiff's Obligations under the agreement.  Wachovia denies the remaining

allegations set forth in paragraph 2 of the Complaint that purport to describe acts by Wachovia or

that purport to characterize the terms of the Agreement, and refers to the documents for their

terms.  Wachovia is without knowledge or information sufficient to form a belief as to the truth

of the remaining allegations set forth in paragraph 2 of the Complaint.

3.      Plaintiff seeks rescission of the swap transaction, the return of all sums Plaintiff
deposited as collateral or otherwise, damages from the breach and/or specific performance and a
permanent injunction against further violations by Wachovia.

**ANSWER:**

Wachovia admits that the purpose of Plaintiff's Complaint is to seek the relief set forth in

paragraph 3 of the Complaint, but denies that Plaintiff is entitled to such relief, in whole or in

part.

## The Parties

4.      Plaintiff is an Isle of Jersey exempted corporation having its principal place of
business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 4 of the Complaint.

5.      Wachovia is a national banking association with its designated main office and
principal place of business in Charlotte, North Carolina.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 5 of the Complaint.

- 3 -

## Jurisdiction and Venue

6.      The parties are of diverse citizenship and the amount in controversy exceeds the sum of $75,000, exclusive of interests and costs.  Accordingly, this Court possesses subject matter jurisdiction of the action pursuant to 28 U.S.C. § 1332.

**ANSWER:**

To the extent that the allegations set forth in paragraph 6 of the Complaint assert

conclusions of law, no response is required.  Wachovia admits the remaining allegations set forth

in paragraph 6 of the Complaint.


7.      In the swap agreement, the parties agreed to submit to the jurisdiction of the Courts of the State of New York and the United States District Court in the Borough of Manhattan, and stipulated to the application of New York law.

**ANSWER:**

Wachovia admits that, pursuant to Section 13(b)(1) of the International Swap Dealers

Association, Inc.'s Master Agreement, dated May 4, 2007, the parties submitted to the

jurisdiction of this Court and to the application of New York law.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 7 of the Complaint.

## Substantive Allegations

The Credit Default Swap

8.      Plaintiff is a hedge fund with approximately $50,000,000 of funds under management.

**ANSWER:**

Wachovia is without knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph 8 of the Complaint.

9.    On or about May 21, 2007, Plaintiff entered into a credit default swap transaction with Wachovia.

**ANSWER:**

Wachovia admits that the Trade Date of the Credit Derivative Transaction on

Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement between Wachovia

and CDO Plus was May 21, 2007.

10.    A credit default swap is a contract under which two financial institutions trade the credit risk of a debt instrument, such as a corporate bond or, in this case, a CDO. A credit default swap bears some similarities to an insurance policy, except that neither counterparty to the swap necessarily holds the debt instrument on which the swap is based. The underlying debt instrument is called the "reference obligation." Under the credit default swap agreement, one party (the "protection buyer," which in this case is Wachovia) pays a fixed, periodic fee to the seller of the swap (the Plaintiff, here). In return for receiving the fee, the seller of the swap agrees to undertake the credit exposure of the underlying debt instrument, *i.e.*, to pay all or a portion of the unpaid obligation to the buyer of the swap upon the triggering of certain credit defaults.

**ANSWER:**

Wachovia admits that it was Party A to the Credit Derivative Transaction between

Wachovia and CDO Plus, which is defined within the Confirmation between Wachovia and

CDO Plus, dated May 30, 2007, (the "Confirmation") as the "Buyer." Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 10 of the Complaint.

11.    In this case, the fee to be paid to Plaintiff is 2.75% per annum, calculated on the "notional amount" of $10,000,000 of the Class B tranche of a collateralized debt obligation, Senior Notes of Forge ABS High Grade CDO Ltd, 2007-1A, which were issued pursuant to an Indenture dated April 11, 2007.[2]

---

[2]    Since neither the Plaintiff nor Wachovia actually owns the CDO but are each simply trading in, or "hedging," the CDO's default risk, the amount of the debt obligation on

**ANSWER:**

Wachovia admits that the Fixed Rate is defined in the Confirmation as 2.75% per annum. Wachovia further admits that the Reference Entity is defined in the Confirmation as Forge ABS High Grade CDO LTD 2007-1A, and the Reference Obligation is "Class B Fifth Priority Senior Secured Floating Rate Notes Due 2053." Wachovia admits that the amount of the Fixed Payments it is obligated to make, pursuant to the Confirmation, is defined in Section 2 of the Confirmation. Wachovia denies the remaining allegations set forth in paragraph 11 of the Complaint. To the extent that footnote 2 to paragraph 11 purports to characterize the written agreement between the parties, Wachovia refers to the written agreement between the parties for its terms.

12.    The contract documents governing the counterparties' rights and obligations under the swap are the 1992 version of the Master Agreement of the International Swap Dealers Association, dated May 4, 2007 (the "ISDA Master Agreement"), the Schedule to the ISDA Master Agreement, dated as of May 4, 2007, the ISDA Credit Support Annex (1994 Definitions) and the Confirmation Letter by Wachovia, dated May 30, 2007.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 12 of the Complaint, subject to the understanding that: (i) Plaintiff is referring to the forms of the Master Agreement (Multicurrency-Cross Border) and the Credit Support Annex published by the International Swaps and Derivatives Association, Inc., formerly known as the International Swap Dealers Association, Inc., ("ISDA"), in 1992 and 1994, respectively; (ii) the Confirmation is in the form of the then-current template published by ISDA and is between the parties rather than by

---

which the fee is calculated (and for which the seller agrees to undertake credit default exposure in return) is termed the "notional" amount.

Wachovia; and (iii) each of the contract document forms were modified or not as agreed to by

the parties.  Wachovia admits the remaining allegations set forth in paragraph 12 of the

Complaint.

      13.    By the terms of the foregoing documents, in the event of any conflict between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control.

**ANSWER:**

Wachovia admits that the ISDA Master Agreement, executed by CDO Plus on May 4,

2007 states, at paragraph 1 (b), that "[i]n the event of any inconsistency between the provisions

of any Confirmation and this Master Agreement (including the Schedule), such Confirmation

will prevail for the purpose of the relevant Transaction."  Wachovia avers that there are no

conflicts or other inconsistencies between the parties' payment obligations set forth in the

Confirmation and the parties' credit support obligations set forth in the ISDA Credit Support

Annex (which is part of the Schedule).

Initial Margin and Floating Payments

      14.    When Plaintiff and Wachovia executed the swap, Plaintiff paid Wachovia $750,000, which is described in paragraph 7 of the Confirmation Letter as the "independent amount."  For purposes of clarity, however, this Complaint instead refers to the deposit of $750,000 as the "initial margin."  The purpose of the initial margin was to secure Wachovia against the credit risk of the counterparty (Plaintiff).

**ANSWER:**

Wachovia admits that CDO Plus transferred the Independent Amount, as defined by

paragraph 7 of the Confirmation, to Wachovia.  Wachovia admits that the purpose of the transfer

of the Independent Amount was to secure Plaintiff's Obligations, as defined by the ISDA Credit

Support Annex.  Wachovia expressly denies that the Independent Amount was "margin," but,

rather, it and the other amounts transferred by Plaintiff under the ISDA Credit Support Annex

were collateral security.  Wachovia denies the remaining allegations set forth in paragraph 14 of

the Complaint.


15.     Under the Confirmation Letter, the only payments that Wachovia may demand
from Plaintiff *after* the initial margin are "Floating Payments."  Wachovia may require Floating
Payments *only* on the basis of a good faith determination by the Calculation Agent (which in this
case is Wachovia) that a "Floating Amount Event" had taken place: (i) the obligor on the
reference obligation (the CDO) had failed to make a required principal or a scheduled interest
payment or (ii) a writedown had taken place according to the method prescribed by the reference
obligation's governing instrument – *not* on the basis of the perceived creditworthiness of the
counterparty (Plaintiff).

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 15 of the Complaint, except

Wachovia admits that it may not demand collateral on the basis of the perceived credit

worthiness of Plaintiff and asserts that it did not do so.  Wachovia avers that Plaintiff's attempt to

summarize the payment obligations of the parties under the Agreement intentionally ignores the

parties' obligations to Transfer Eligible Credit Support, which are set forth in the ISDA Credit

Support Annex.  Such Transfers of Eligible Credit Support are not determined by the Calculation

Agent.  The parties' credit support obligations at any given time are determined by the parties'

valuation of Exposure, among other things, as defined in the Agreement.  Insofar as Plaintiff

purports to characterize the agreements between the parties, Wachovia refers to the agreements

for their terms.


16.     Apart from the initial margin and Floating Payments, the Confirmation Letter
does not otherwise authorize Wachovia to demand payments of any kind to secure Wachovia
against the credit risk of the counterparty or the reference obligation.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 16 of the Complaint and refers to

the agreements between the parties for their terms. Further, the Confirmation supplements,

forms a part of, is subject to, and is governed by the ISDA Master Agreement (including the

Schedule and the ISDA Credit Support Annex), and the ISDA Credit Support Annex authorizes

Wachovia to demand collateral from Plaintiff as security for its Obligations.

17.    On some swaps, margin may be collected after the initial margin. In such cases,
the additional margin is referred to as "variation margin" and is based upon a downward
movement in the mark-to-market value of the underlying obligation.

**ANSWER:**

Wachovia is without knowledge or information sufficient to form a belief as to the truth

of the allegations set forth in paragraph 17 of the Complaint.

18.    In or about April 2007, before the parties entered into the swap agreement,
Wachovia had originally demanded initial margin in the amount of $1,500,000, but Plaintiff
informed Wachovia that the trade would not make economic sense for Plaintiff unless the initial
margin were reduced to $750,000.

**ANSWER:**

Wachovia admits that the parties negotiated the terms of the Independent Amount and

ultimately agreed on the amount defined by paragraph 7 of the Confirmation. Wachovia denies

that the parties negotiated initial margin, and denies the remaining allegations set forth in

paragraph 18 of the Complaint.

19.    Wachovia ostensibly acquiesced, and entered into the swap with Plaintiff on those
terms, knowing at the time that it would simply contrive later to demand more collateral on the
pretext of a decline in the mark-to-market value of the reference obligation, *i.e.*, once Plaintiff
was locked into to the trade. (The CDO matures in 2053).

**ANSWER:**

Wachovia admits that the Legal final maturity date of the Reference Obligation is

October 05, 2053.  Wachovia denies the remaining allegations set forth in paragraph 19 of the

Complaint.


20.    Plaintiff wired the $750,000 of initial margin to Wachovia's account on or about
May 30, 2007.

**ANSWER:**

Wachovia admits that CDO Plus wired the Independent Amount to Wachovia on or about

May 30, 2007 and otherwise denies the allegations in paragraph 20.


Wachovia Squeezes Plaintiff for More Money

21.    However, less than three weeks later, Wachovia demanded an additional amount
of collateral, requiring a deposit of $320,000 on or about June 18, 2007.  Several days later,
Wachovia requested an additional $430,000.  Tellingly, the sum of the initial margin and these
two latter deposits comes to a total of $1,500,000 – precisely the amount that Wachovia had
wanted in the first instance and that Plaintiff had thought it had bargained down to $750,000.

**ANSWER:**

Wachovia admits that, on June 18 and 21, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded Transfers of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex.

Wachovia denies the remaining allegations set forth in paragraph 21 of the Complaint.


22.    Nor was Wachovia finished at $1,500,000.  Wachovia continued to ratchet up its
demands for variation margin over the weeks that followed:

| Date | Amount |
| --- | --- |
| May 30, 2007 | $750,000 (initial deposit) |

| June 18, 2007 | $320,000 |
| June 21, 2007 | $430,000 |
| June 26, 2007 | $300,000 |
| July 12, 2007 | $270,000 |
| July 20, 2007 | $740,000 |
| July 24, 2007 | $490,000 |
| July 30, 2007 | $310,000 |
| August 15, 2007 | $400,000 |
| August 21, 2007 | $760,000 |
| September 10, 2007 | $1,010,000 |
| October 15, 2007 | $780,000 |
| October 18, 2007 | $890,000 |
| October 30, 2007 | $850,000 |
| November 1, 2007 | $620,000 |

**ANSWER:**

Wachovia admits that, pursuant to paragraph 3 of the ISDA Credit Support Annex,

Wachovia demanded Transfers of Eligible Credit Support as collateral security for Plaintiff's

Obligations in accordance with the ISDA Credit Support Annex on the dates and the in amounts

corresponding to those set forth on the chart in paragraph 22. Wachovia denies the remaining

allegations set forth in paragraph 22 of the Complaint.


23.    In sum, Wachovia demanded, and Plaintiff paid, $8,920,000 over a period of five
months purportedly to secure Wachovia against a total credit risk of $10,000,000 from an
investment-grade debt instrument.

**ANSWER:**

Wachovia admits that as of the date Plaintiff's original complaint was filed, CDO Plus

had deposited with Wachovia $8.92 million pursuant to its credit support obligations under the

ISDA Credit Support Annex. Wachovia denies the remaining allegations set forth in paragraph

23 of the Complaint.

24.    However, upon information and belief, during the entire period described in the table above, and as of the date of the filing of the original Complaint in this action, the reference obligation (Forge ABS High Grade CDO Ltd, 2007-1A) had not experienced any shortfall in principal or interest payments whatsoever.

**ANSWER:**

Wachovia admits that between May 30 and November 28, 2007, Wachovia did not give

notice of any Floating Amount Events or Credit Events. Wachovia further admits that the

Reference Entity is defined in the Confirmation as Forge ABS High Grade CDO LTD 2007-1A,

and the Reference Obligation is "Class B Fifth Priority Senior Secured Floating Rate Notes Due

2053." Wachovia avers that whether the Reference Obligation experienced any shortfall in

principal or interest payments is not solely determinative of whether a party to the Agreement is

required to make a Transfer of Eligible Credit Support. There are many reasons why a party

might be required to make a Transfer of Eligible Credit Support. Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 24 of the Complaint.


25.    Also upon information and belief, during the same period, no write-down had taken place according to the reference obligation's controlling documents resulting in any reduction of the outstanding principal amount of the reference obligation, nor had any other write-down taken place such that Plaintiff could properly have been required to make a Floating Payment to Wachovia. Upon information and belief, from the date when Wachovia and Plaintiff first entered into the credit default swap, and as of the date of this Complaint, the reference obligation has at all times been and continues to be an investment grade debt instrument.

**ANSWER:**

Wachovia admits that between May 30 and November 28, 2007, Wachovia did not give

notice of any Floating Amount Events or Credit Events. Wachovia avers that whether Plaintiff

would have been required to make a Floating Payment to Wachovia is not solely determinative

of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 25 of the Complaint.

26.     Under paragraph 6(b) of the Confirmation Letter, Wachovia, as calculation agent, was obliged to determine Plaintiff's obligation to pay sums to Wachovia *solely* upon the basis of a report of the servicer of the underlying reference obligation.[3]

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 26 of the Complaint. Wachovia avers that the parties' obligations to make or demand Transfers of Eligible Credit Support are set forth in paragraph 3 of the ISDA Credit Support Annex, and are not governed by paragraph 6(b) of the Confirmation Letter. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in footnote 3 of paragraph 26 of the Complaint.

27.     At first, Plaintiff delivered the additional collateral requested by Wachovia without protest. However, after the August 15, 2007 margin call, Plaintiff wrote to Wachovia expressing grave concern that it had been required, within a few short weeks from the launch of the CDO, to post collateral in the amount of $3,260,000 above and beyond the initial margin, for a total of over *40%* of the notional amount.

**ANSWER:**

Wachovia admits that it received a letter from Robert H. Fasulo, General Counsel for Vanquish Capital Group, LLC, dated August 16, 2007 and refers to the letter for its terms. Wachovia avers that it responded to Fasulo's August 16 letter in an email message dated August 21, 2007 and refers to the email message for its terms. Wachovia is without knowledge or

---

[3]     Pursuant to the indenture of a collateralized debt obligation, a servicer performs the ministerial task of calculating payment amounts and preparing reports regarding the interest and principal due to be paid on the CDO.

information sufficient to form a belief as to the truth of the remaining allegations set forth in

paragraph 27 of the Complaint.


28.    While Plaintiff believed it was not obligated to pay the sums demanded by
Wachovia, it did so because it was concerned that Wachovia would seize upon Plaintiff's refusal
to post variation margin as an excuse to declare a technical default and seize Plaintiff's collateral
– which ultimately, Wachovia did.

**ANSWER:**

Wachovia admits that as a result of Plaintiff's default, Wachovia caused an early

termination of the Agreement, exercised its right to liquidate the Posted Collateral, and applied

the liquidation proceeds to satisfy a portion of Plaintiff's Obligations under the agreement.

Wachovia is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations set forth in paragraph 28 of the Complaint.


29.    Wachovia responded that it was entitled to require variation margin pursuant to
the Credit Support Annex to the ISDA Master Agreement, due to the deterioration in the mark-
to-market value of the reference obligation.

**ANSWER:**

Wachovia admits that, pursuant to paragraph 3 of the ISDA Credit Support Annex, it was

entitled to:  (i) value Exposure on a mark-to-market basis; (ii) demand Transfers of Eligible

Credit Support; and (iii) that it did demand such Transfers.  Wachovia is without knowledge or

information sufficient to form a belief as to the truth of the remaining allegations set forth in

paragraph 29 of the Complaint.


30.    Although the overall CDO market had certainly experienced considerable turmoil
during the summer of 2007, no credit event had yet occurred such that Plaintiff should have been
required to make a Floating Payment.  While one rating agency, Fitch, had downgraded the
reference obligation from "AA" to "A," the "A" rating is an investment grade rating and does not

constitute a credit event within the meaning of the swap documents. No such downgrade was announced by the relevant rating agencies, Standard & Poors or Moody's.

**ANSWER:**

Wachovia admits that in the summer of 2007, it did not give notice of any Floating Amount Events or Credit Events. Wachovia avers that whether Plaintiff was required to make a Floating Payment is not solely determinative of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support. Wachovia admits that in November 2007 Moody's downgraded the Reference Obligation from "AA" to "A," that on January 30, 2008 the Reference Obligation experienced an Event of Default, and on February 8, 2008 Moody's downgraded the Reference Obligation to "Ca". Wachovia is without knowledge or information sufficient to form a belief as to the remaining allegations set forth in paragraph 30 of the Complaint.

31.    Moreover, even if Wachovia had been entitled to demand variation margin, *i.e.*, to secure Wachovia against the deteriorating credit risk of the reference obligation (which was beyond the obligations accepted by Plaintiff in the Confirmation Letter), Wachovia failed even to make a good faith estimate of the required collateral. Indeed, by Plaintiff's calculation, using similar CDO's as a point of comparison, the reference obligation may have actually appreciated during the same period when Wachovia was demanding collateral.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 31 of the Complaint insofar as they purport to characterize the acts of Wachovia or the terms of the Agreement. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 31 of the Complaint.

32.    In such an event, even under Wachovia's interpretation of the swap agreements, Wachovia would have been required to *return* a portion of the collateral to Plaintiff, and certainly not to demand more. Thus, even assuming that Wachovia faced exposure on the

reference obligation, considering the volatility of the CDO market, it would be highly unlikely, if not impossible, that the calculation of Wachovia's exposure would in every case call for a payment by Plaintiff to Wachovia.

**ANSWER:**

Wachovia denies that it was required to return any collateral to Plaintiff and that it was not entitled to demand the collateral that it demanded. Wachovia avers that Plaintiff, as Pledgor, never made a demand for a Return Amount, pursuant to paragraph 3 of the ISDA Credit Support Annex. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the hypothetical allegations set forth in paragraph 32 of the Complaint.

Wachovia Admits that it Breached the Swap Agreement

33.    In August 2007, Plaintiff contacted a trader at Wachovia, requesting that Wachovia explain the rationale for the repeated margin calls.

**ANSWER:**

Wachovia admits that its traders had numerous conversations with representatives of Plaintiff in August 2007 and may have discussed the rationale for demanding additional collateral. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 33 of the Complaint.

34.    Wachovia admitted that it had *not* used the servicer's report or other independent pricing data in evaluating the credit risk of the reference obligation and that the obligation at issue had not been actively traded in the previous few weeks, thereby making an accurate mark-to-market based upon bid prices nearly impossible.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 34 of the Complaint except as to its knowledge of the trading activity in the reference obligation.

35.    Tellingly, a salesman at Wachovia further revealed to Plaintiff that his credit department was pressuring him regarding the "chunkiness of the position," *i.e.*, relative to the size of Plaintiff's portfolio.

**ANSWER:**

Wachovia admits that its salespeople have spoken with representatives at CDO Plus but

denies knowledge or information sufficient to form a belief at this time as to the truth of the

remaining allegations set forth in paragraph 35 of the Complaint.

36.    Thus, the margin calls had been expressly used by Wachovia not to satisfy Plaintiff's obligation to make a "Floating Payment," or even to secure Wachovia against any objectively verifiable credit risk of the reference obligation, but solely to protect Wachovia against the perceived creditworthiness of the counterparty (Plaintiff), in violation of the swap agreement.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 36 of the Complaint.

37.    As of the date of this Amended Complaint, Plaintiff had delivered $8,920,000 in collateral against the notional amount of $10,000,000.

**ANSWER:**

Wachovia admits that as of the date Plaintiff's original complaint was filed, CDO Plus

had deposited with Wachovia $8.92 million pursuant to its credit support obligations under the

ISDA Credit Support Annex.  Wachovia denies the remaining allegations set forth in paragraph

37 of the Complaint.

Wachovia Escalates its Margin Demands

38.    On November 21, 2007 (the day before Thanksgiving), Wachovia made a demand for $550,000 of additional margin.

**ANSWER:**

Wachovia admits that, on November 21, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.

39.    Inasmuch as the collateral thus requested would amount to almost 95% of the entire notional amount, Plaintiff notified Wachovia by letter dated November 21, 2007 that it was compelled to invoke the dispute resolution procedures of the ISDA Credit Support Annex.

**ANSWER:**

Wachovia admits that in a letter dated November 21, 2007, CDO Plus invoked the

Dispute Resolution provision of paragraph 5 of the ISDA Credit Support Annex.  Wachovia is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations set forth in paragraph 39 of the Complaint.

40.    In the same letter, Plaintiff further requested that Wachovia forward a copy of the servicer's report for the underlying reference obligation.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 40 of the Complaint.

41.    At first, Wachovia did not respond to the November 21 letter.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 41 of the Complaint. Wachovia

avers that it did respond orally and in writing to Plaintiff's November 21 letter, and refers to

those responses for their terms.

42.    Instead, on the next business day, which was the day after Thanksgiving,
Wachovia sent a new margin call, this time in the amount of $810,000.

**ANSWER:**

Wachovia admits that, on November 23, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.

43.    Intriguingly, the margin call for November 23, 2007, which demanded $260,000
more collateral than the November 21, 2007 margin call, recited that it constituted "notice of the
following Collateral Movement as of Close of Business of 22 November 2007," which was
Thanksgiving Day.

**ANSWER:**

Wachovia admits that, on November 23, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms. Wachovia admits that November 22, 2007 was Thanksgiving Day.

Wachovia avers that the date reflected on its November 23 demand for Transfer of Eligible

Credit Support reflects nothing more than a computer generated response that may not have

processed the fact that November 22, 2007 was Thanksgiving Day.

44.    As it had in response to the November 21, 2007 margin call, Plaintiff notified Wachovia that it was invoking the dispute resolution mechanism of the ISDA Credit Support Annex and would therefore not post any further collateral until the matter was resolved.

**ANSWER:**

Wachovia admits that it received a letter from CDO Plus dated November 23, 2007 and

refers to the letter for its terms.

45.    On the morning of the following business day, November 26, 2007, Wachovia again sent a new margin call – the third in three consecutive days – this time demanding $820,000.

**ANSWER:**

Wachovia admits that, on November 26, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms.

46.    It was not until later in the day that Wachovia finally held a conference call with Plaintiff's principals to attempt a resolution of the dispute.

**ANSWER:**

Wachovia admits that it participated in a conference call with representatives of CDO

Plus on November 26, 2007 and denies the remaining allegations set forth in paragraph 46.

47.    When asked why Wachovia had suddenly started sending daily margin calls, Wachovia's counsel responded that Wachovia marked the position to market daily (even though Wachovia had never issued daily margin calls to Plaintiff before).

**ANSWER:**

Wachovia admits that it informed CDO Plus that Wachovia determined the Credit

Support Amount as defined by paragraph 3 of the ISDA Credit Support Annex by marking the

position to the market. Wachovia avers that pursuant to paragraph 13(c)(ii) of the ISDA Credit

Support Annex, Wachovia was entitled to mark the position on a daily basis. Wachovia avers

that Plaintiff's receipt of daily demands for Transfer of Eligible Credit Support was due to the

fact that Plaintiff continued to refuse to post collateral (and therefore continued to receive

demands from Wachovia), not a reflection of a change in Wachovia's method of valuing

Exposure. Wachovia denies the remaining allegations set forth in paragraph 47 of the

Complaint.


48.    On November 27, 2007, Wachovia sent yet another margin call, this time calling
for $1,490,000 of additional collateral, for a total of $10,410,000 – almost half a million dollars
*more* than the notional amount of the swap!

**ANSWER:**

Wachovia admits that, on November 27, 2007, pursuant to paragraph 3 of the ISDA

Credit Support Annex, Wachovia demanded a Transfer of Eligible Credit Support as collateral

security for Plaintiff's Obligations in accordance with the ISDA Credit Support Annex and refers

to the demand for its terms. The ISDA Credit Support Annex entitles Wachovia to demand such

collateral in an amount up to the sum of the $10 million notional amount of the Swap, the

$750,000 Independent Amount and the Exposure to interest on the Reference Obligation. The

$10,410,000 total demanded by Wachovia is less than such sum.


49.    Wachovia also sent four market quotations of the swap, expressed in "points
upfront," which purported to justify Wachovia's exorbitant margin calls, suggesting that the

reference obligation's creditworthiness had deteriorated to the point that it was worth approximately five cents on the dollar.

**ANSWER:**

Wachovia admits that it provided market quotations to CDO Plus and refers to the context of those documents for their terms. Wachovia further avers that it performed in accordance with the dispute resolution provisions of the ISDA Credit Support Annex. Wachovia denies the remaining allegations set forth in paragraph 49 of the Complaint.

50.    At the same time, Wachovia finally included a copy of the servicer's report, which revealed that *none* of the securities pooled in the reference obligation had defaulted and that the vast majority of those securities continued to be investment grade.

**ANSWER:**

Wachovia admits that it provided CDO Plus with a copy of a Servicer's Report, dated November 5, 2007, and refers to that Report for its terms. Wachovia avers that whether any of the securities collateralizing in the Reference Obligation defaulted or remained investment grade is not solely determinative of whether a party to the Agreement is required to make a Transfer of Eligible Credit Support.

51.    Upon reviewing the servicer's report, Plaintiff was able to confirm that Wachovia had not been collecting "Floating Payments," since no "Floating Amount Event" had taken place.

**ANSWER:**

Wachovia admits that, as of November 5, 2007, it had not given notice of any Floating Amount Events or Credit Events. Wachovia refers to the Servicer's Report for its terms and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 51 of the Complaint.

52.    Moreover, even if Wachovia were entitled to demand margin (as distinguished from Floating Payments), Wachovia had failed to calculated its "exposure" to the credit risk of the reference obligation in good faith.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 52 of the Complaint.

53.    The creditworthiness of the reference obligation has not been impaired, at least not to the extent that collateral should be demanded in the amount of more than 100% of the notional amount of the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 53 of the Complaint.

54.    Wachovia had therefore improperly demanded and collected sums that Plaintiff should never have been required to pay.  The demand by Wachovia for over $10,000,000 in cash to collateralize a swap based on the $10,000,000 notional amount of an investment-grade CDO was commercially unreasonable – indeed, absurd – and unnecessarily tied up nearly 20% of the Plaintiff's funds, to the detriment of Plaintiff's investors.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 54 of the Complaint insofar as

they purport to characterize any actions of Wachovia as inappropriate.  Wachovia is without

knowledge or information sufficient to form a belief as to the truth of the remaining allegations

set forth in paragraph 54 of the Complaint.

55.    At the same time, it allowed Wachovia artificially to minimize its overall exposure to the turbulence in the CDO market caused by the collapse in the sub-prime lending market, at the expense of Plaintiff and its investors.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 55 of the Complaint insofar as they purport to characterize any actions of Wachovia as inappropriate. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 55 of the Complaint.

Plaintiff Files the Lawsuit in Supreme Court and
Wachovia Declares an Event of Default

56.    On November 28, 2007, Plaintiff commenced the instant civil action in the Supreme Court of the State of New York. On December 7, 2007, Wachovia removed this action to the United States District Court for the Southern District of New York.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 56 of the Complaint.

57.    On December 7, 2007, Wachovia sent Plaintiff a Notice of Failure to Transfer, reciting that "*[a]s of November 28, 2007* and continuing through the date hereof, Counterparty [*i.e.*, Plaintiff] has failed to make, when due, one or more Transfers of Eligible Collateral in an amount equal to $1,740,000 to Wachovia as required under the Credit Support Annex. Counterparty's failure to Transfer will become an Event of Default under Paragraph 7(i) of the Credit Support Annex and Section 5(a)(iii)(1) of the Agreement if the required amount of Eligible Collateral is not delivered to Wachovia on or before the first Local Business Day after this notice is delivered to you."

**ANSWER:**

Wachovia admits that on December 7, 2007, it sent Plaintiff a Notice of Failure to Transfer and refers to the Notice for its complete terms.

58.    Plaintiff declined to pay any further sums to Wachovia.

- 24 -

**ANSWER:**

Wachovia admits that Plaintiff continued to refuse to meet its credit support obligations

to Wachovia.

59.    On or about December 10, 2007, Wachovia sent Plaintiff a Notice of Event of
Default.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 59 of the Complaint.

60.    On December 13, 2007, Wachovia sent Plaintiff a Notice of Early Termination,
and designated December 18, 2007 as the Early Termination Date.

**ANSWER:**

Wachovia admits the allegations set forth in paragraph 60 of the Complaint.

61.    On December 20, 2007, Wachovia notified Plaintiff that it was closing out the
swap transaction. Wachovia purported to determine its loss on the transaction as $9,990,000,
based upon quotations for the reference obligation that it had obtained from market-makers.

**ANSWER:**

Wachovia admits that, on December 20, 2007, it sent Plaintiff a Notice of Amount Due

Following Early Termination and refers to the Notice for its terms. Wachovia denies the

remaining allegations set forth in paragraph 61 of the Complaint.

62.    Wachovia further stated that a Writedown in the amount of $10,000,000 had
occurred with respect to the Reference Obligation. However, no such Writedown had occurred
within the meaning of the Confirmation Letter.

**ANSWER:**

Wachovia admits that in the December 20, 2007 Notice of Amount Due Following Early

Termination, it stated that "The most recent Servicer Report regarding the Reference Obligation

indicates that a Writedown has occurred with respect to the Reference Obligation." Wachovia

refers to the Notice for its complete terms. Wachovia denies the remaining allegations set forth

in paragraph 62 of the Complaint.


Wachovia Converts Plaintiff's Collateral

63.    On or about December 27, 2007, Wachovia notified Plaintiff that it had foreclosed
on the $8,920,000 of collateral, and that Plaintiff owed Wachovia the amount of the
"deficiency," $1,030,861.12, together with interest and other amounts, including collection costs
and legal fees.

**ANSWER:**

Wachovia admits that, on December 27, 2007, it sent Plaintiff a Notice of Amount Due

Following Application of Collateral and refers to the Notice for its terms.


**AS AND FOR A FIRST CAUSE OF ACTION**
**(For Rescission - Fraud)**

64.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 64 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 63 of the Complaint as if fully set forth herein.


65.    Wachovia made numerous false representations to, and concealed material
existing facts from Plaintiff, specifically, that it would require no more than $750,000 to secure
Wachovia against its perceived counterparty risk.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 65 of the Complaint.

66.    In fact, Wachovia knew when it entered into the swap with Plaintiff that it would simply extract additional collateral under the pretext of write-downs to the value of the reference obligation, *i.e.*, once Plaintiff had already locked itself into the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 66 of the Complaint.

67.    The foregoing representations were false and known to be false by Wachovia when they were made, for the purpose of enticing Plaintiff into making the swap.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 67 of the Complaint.

68.    But for Wachovia's misrepresentations and omissions, Plaintiff would not have consummated the swap transaction with Wachovia. By reason of the foregoing, Plaintiff is entitled to rescission of the swap and restitution by Wachovia of all sums paid by Plaintiff to date, including without limitation the initial margin and all further sums paid as collateral.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 68 of the Complaint constitute

legal conclusions to which no answer is required. To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 68 of the Complaint.

## AS AND FOR A SECOND CAUSE OF ACTION
### (For Rescission - Mistake)

69.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 69 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70.     No meeting of the minds had been achieved at the time that the parties entered
into the swap transaction.  Based upon the Confirmation Letter and the negotiations leading up to
it, Plaintiff had agreed to sell credit protection on a credit default swap, not to take the risk of
daily mark-to-market movements in the value of the reference obligation.  Wachovia was aware
that the Confirmation Letter stipulated only Floating Payments, not margin based upon daily
changes in the creditworthiness of the Forge CDO, but did not address the discrepancy until after
Plaintiff had closed on the trade in May 2007.  As to Plaintiff, the mistake was honest and
excusable, such that enforcement of the variation margin provision would therefore be
unconscionable.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 70 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 70 of the Complaint.

71.     Accordingly, Plaintiff is entitled to an equitable rescission or reformation of the
swap and a return of its collateral.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 71 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 71 of the Complaint.

## AS AND FOR A THIRD CAUSE OF ACTION
### (For Damages from Wachovia's Fraud)

72.     Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 72 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 71 of the Complaint as if fully set forth herein.

73.    The misrepresentations and omissions set forth herein were engaged in by
Wachovia with intent to deceive Plaintiff and constitute fraud under principles of common law
entitling Plaintiff to an award of compensatory damages in an amount to be determined at trial,
as well as incidental damages incurred in connection with the negotiation, execution and
consummation of the swap.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 73 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 73 of the Complaint.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract)

74.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 74 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 73 of the Complaint as if fully set forth herein.

75.    Plaintiff has performed all of its obligations under the swap agreement.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 75 of the Complaint.

76.    Wachovia has breached the agreement, *inter alia*, by demanding the deposit of
collateral far in excess of the amount actually required.

- 29 -

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 76 of the Complaint.

77.    Plaintiff has been thereby damaged in an amount to be determined at trial.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 77 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia denies the allegations set forth in paragraph 77 of the Complaint.

### AS AND FOR A FIFTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 78 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.    By gradually making oppressive margin demands without justification, Wachovia
acted in a manner so as to deprive Plaintiff of the right to receive the benefit of the swap
agreement, namely, the premium to be paid by Wachovia on the notional amount at a cost to
Plaintiff no greater than the opportunity cost of the collateral actually required to secure
counterparty risk and credit risk.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 79 of the Complaint.

80.    To the extent that the swap agreement gave Wachovia any discretion as
calculation agent in the determination of the credit risk of the reference obligation, the implied
covenant of good faith and fair dealing included a promise on the part of Wachovia not to act
arbitrarily or irrationally in exercising that discretion.

- 30 -

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 80 of the Complaint constitute

legal conclusions to which no answer is required.  To the extent that an answer is required,

Wachovia admits that the parties were required to perform all obligations under the agreement in

good faith, avers that it did so and otherwise denies the allegations set forth in paragraph 80.


81.    By extracting collateral from Plaintiff far in excess of what Wachovia actually
required, Wachovia has damaged Plaintiff in an amount to be determined at trial.

**ANSWER:**

To the extent that an answer is required, Wachovia denies the allegations set forth in

paragraph 81 of the Complaint.


## AS AND FOR A SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

82.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth
herein.

**ANSWER:**

For its answer to paragraph 82 of the Complaint, Wachovia repeats and re-alleges its

responses to paragraphs 1 through 81 of the Complaint as if fully set forth herein.


83.    By extracting an unnecessarily large amount of collateral from Plaintiff,
Wachovia received money properly belonging to the Plaintiff.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 83 of the Complaint.


84.    Wachovia has benefited and is benefiting from the receipt of those funds and,
under principles of equity and good conscience, Wachovia should not be permitted to retain such

collateral in any amount beyond the sums required to offset the credit risk of the reference obligation.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 84 of the Complaint constitute legal conclusions to which no answer is required.  To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 84 of the Complaint.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (For a Permanent Injunction/Specific Performance)

85.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 85 of the Complaint, Wachovia repeats and re-alleges its responses to paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.    Wachovia's breach of the swap agreement violates a present right of the Plaintiff.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 86 of the Complaint constitute legal conclusions to which no answer is required.  To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 86 of the Complaint.

87.    If Plaintiff's liquidity continues to be impaired by Wachovia's unjustified retention of over $8,000,000 in collateral, Plaintiff will face serious and irreparable injury in the form of the loss of present and/or prospective investors, who will be chilled by the future impact of Wachovia's impairment of the fund's liquidity.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 87 of the Complaint constitute legal conclusions to which no answer is required. To the extent that a response is required, Wachovia denies the allegations set forth in paragraph 87 of the Complaint insofar as they purport to characterize any actions of Wachovia as inappropriate. Wachovia is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 87 of the Complaint.

88.    The equities are balanced in the Plaintiff's favor; Plaintiff has complied with its obligations, whereas Wachovia has misled Plaintiff as to its intentions.

**ANSWER:**

To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 88 of the Complaint.

89.    The public interest will not be injured in any way if Wachovia is forced to honor its contract and remit the approximately $8,000,000 it has wrongfully demanded and withheld.

**ANSWER:**

Wachovia states that the allegations set forth in paragraph 89 of the Complaint call for a legal conclusion for which no answer is required. To the extent that an answer is required, Wachovia denies the allegations set forth in paragraph 89 of the Complaint.

### AS AND FOR A EIGHTH CAUSE OF ACTION
### (Conversion)

90.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

**ANSWER:**

For its answer to paragraph 90 of the Complaint, Wachovia repeats and re-alleges its responses to paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.    Wachovia intentionally retained and then, beyond the scope of its authorization, disposed of the collateral properly belonging to Plaintiff.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 91 of the Complaint.

92.    The funds in question are specifically identifiable in that they were deposited solely to collateralize the swap and were required to be returned to Plaintiff.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 92 of the Complaint.

93.    Wachovia has failed and refused to comply with Plaintiff's demand that Wachovia return the excess collateral.

**ANSWER:**

Wachovia denies the allegations set forth in paragraph 93 of the Complaint.

## ADDITIONAL DEFENSES

1.    For its first affirmative defense, Wachovia alleges that the allegations of the Complaint, in whole or in part, fail to state a claim for which relief may be granted.

2.    For its second affirmative defense, Wachovia alleges that Plaintiff's claims are barred by the equitable doctrines of laches and estoppel.

3.    For its third affirmative defense, Wachovia alleges that Plaintiff's claims may be barred, in whole or in part, by the doctrine of unclean hands.

4.    For its fourth affirmative defense, Wachovia alleges that the rights and obligations of the parties are governed by the terms of the agreement between the parties, and, therefore, Plaintiff's' tort claims are precluded as a matter of law.

5.    For its fifth affirmative defense, Wachovia alleges that damages, if any, alleged to have been suffered by Plaintiff are subject to offset by damages Plaintiff caused to Wachovia as a result of Plaintiff's conduct.

6.    For its sixth affirmative defense, Wachovia alleges that damages, if any, alleged to have been suffered by Plaintiff were caused, in whole or in part, by the intentional conduct, negligent conduct, fault, or other culpable conduct of Plaintiff or others over whom Plaintiff exercised control.

7.    For its seventh affirmative defense, Wachovia alleges that, at all times, it has acted in accordance with the agreements, and, therefore, Plaintiff is not entitled to the judgment demanded.

8.    For its eighth affirmative defense, Wachovia alleges that Plaintiff has been paid all monies due and owing under the terms of the agreement.

9.    For its ninth affirmative defense, Wachovia alleges that, at all times, Plaintiff had equal or superior knowledge of all relevant matters, including: (1) the rights and obligations of the agreement between the parties; (2) the value of the Credit Support Amount as defined by the ISDA Credit Support Annex; (3) the value of the Exposure as defined by the ISDA Credit Support Annex; and (4) the financial condition of the Reference Obligation as defined by the Confirmation.

10.    For its tenth affirmative defense, Wachovia alleges that Plaintiff has failed to mitigate any damages it has allegedly suffered.

11.    Wachovia hereby reserves the right to rely on such other additional defenses as may become available or apparent during discovery.

## WACHOVIA'S COUNTERCLAIM

## PARTIES

1.    Plaintiff CDO Plus is an Isle of Jersey exempted corporation having its principal place of business at Le Masurier House, St. Helier JE2 4YE Jersey, Channel Islands.

2.    CDO Plus was incorporated in Jersey on June 13, 2006.  Effective November 21, 2007, CDO Plus changed its name to VCG Special Opportunities Master Fund Limited.

3.    Wachovia Bank, National Association is a national banking association and a wholly owned subsidiary of Wachovia Corporation.  Wachovia Bank, National Association has its principal place of business located at 301 South College Street, Charlotte, North Carolina.

## Jurisdiction and Venue

4.    This court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interest and costs.  The parties also consented to this Court's jurisdiction in the Agreement that is the subject of this dispute.

5.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(d).  The parties also consented to this venue in the Agreement that is the subject of this dispute.

## Substantive Allegations

### PLAINTIFF IS A SOPHISTICATED INVESTOR

6.    CDO Plus is a hedge fund with extensive experience investing in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

- 37 -

7.    CDO Plus asserts that "[i]nvestors in the fund will have the opportunity to invest in a CDO strategy "with a twist"; one fund that simultaneously earns returns from CDO debt/CDO equity AND participates in management fees from CDO deals."

8.    CDO Plus asserts that its "investment team members are all seasoned professionals with extensive experience in fixed income, structured products markets, and hedge funds."

9.    Upon information and belief, CDO Plus has entered into numerous derivative swap transactions.

10.    CDO Plus is managed and controlled by the Vanquish Capital Group.

11.    At all relevant times, rékon advisors llc has acted as CDO Plus's Investment Manger.

12.    Upon information and belief, Vanquish Capital Group has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

13.    Upon information and belief, rékon advisors llc has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

14.    Don Uderitz is a director of CDO Plus.

15.    Jorge Rodriquez-Lugo is a director of CDO Plus.

16.    Don Uderitz and Jorge Rodriquez-Lugo control rékon advisors llc.

17.    Don Uderitz and Jorge Rodriquez-Lugo are principals with Vanquish Capital Group.

18.    Robert H. Fasulo, Esq. is the General Counsel of Vanquish Capital Group.

19.     Don Uderitz has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

20.     Uderitz asserts that his experience includes, but is not limited to:  (i) "through a unique joint venture arrangement . . . direct[ing] all [] Tax Related Products at Wachovia Securities with primary responsibility for the portfolio management of tax related structured products;" (ii) serving as a "general partner[] and co-head of mortgage trading for the III Global Funds;" (iii) serving as a "general partner in Adams, Viner and Mosler, Ltd., a registered broker dealer;" and (iv) serving as a "Senior Vice President and Portfolio Manager for Ocwen Financial Corporation."

21.     Uderitz also considers himself "to be one of the foremost authorities on REMIC residuals."

22.     Jorge Rodriquez-Lugo has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

23.     Rodriquez-Lugo asserts that his experience includes, but is not limited to:  (i) serving as "a Senior Vice President at Lehman Brother's Private Investment Management Division;" (ii) working at "AVM promoting unique arbitrage opportunities using mortgage securities and derivatives to a select group of institutional clients in the U.S.;" and (iii) serving for 14 years as a "senior institutional mortgage and derivatives sales person at various Wall Street firms."

24.     Robert H. Fasulo, Esq. has extensive experience managing investments in collateralized debt obligations, derivative swap transactions, and other sophisticated commercial transactions.

## WACHOVIA AND CDO PLUS ENTER INTO A DERIVATIVE SWAP TRANSACTION

25.     In the spring of 2007, Plaintiff approached Wachovia and sought to enter into a derivative swap transaction worth $10 million.

26.     In May 2007, CDO Plus entered into a Credit Derivative Transaction on Collateralized Debt Obligation with Pay-As-You-Go or Physical Settlement (the "Derivative Swap Transaction" or "Transaction") with Wachovia.

27.     Under the terms of the Transaction, Wachovia agreed to pay CDO Plus a fixed amount quarterly over the life of the Reference Obligation (in this case a collateralized debt obligation ("CDO")).

28.     In return, CDO Plus was required to pay Wachovia amounts in respect of certain events associated with the CDO, if and when those events occurred.

29.     If the investment was successful, and the underlying CDO thrived, CDO Plus stood to receive a quarterly fixed amount from Wachovia for the life of the CDO or until the parties agreed to terminate the swap.

30.     If the investment was unsuccessful, CDO Plus would have to pay Wachovia principal-related amounts up to $10 million, and interest-related amounts, to cover amounts in respect of the events associated with the underlying CDO.

31.     The Trade Date of the Transaction was May 21, 2007.

32.     The Effective Date of the Transaction was May 24, 2007.

33.     The terms of the Transaction were governed by four documents:  (1) an ISDA Master Agreement, dated May 4, 2007; (2) the Schedule to the Master Agreement dated as of May 4, 2007; (3) an ISDA Credit Support Annex dated as of May 4, 2007, which incorporates by reference the ISDA 1994 Credit Support Annex; and (4) a Confirmation dated May 30, 2007

(collectively, the "Agreement"). Copies of each of these documents are attached as Exhibits 1-4 to Wachovia's Counterclaim.

34. The ISDA Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

35. The Schedule to the Master Agreement was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

36. The ISDA Credit Support Annex was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 4, 2007.

37. The Confirmation was executed by Don Uderitz on behalf of CDO Plus Master Fund, Ltd. on or about May 30, 2007.

38. The Agreement represented the entire understanding of the parties to the Derivative Swap Transaction.

39. The terms of the Agreement are not ambiguous.

40. The terms of the Agreement are not in conflict.

SIGNIFICANT TERMS OF THE AGREEMENT

41. The Reference Obligation is defined in Section 1 of the Confirmation.

42. The Initial Face Amount of the Agreement is USD $10,000,000.00.

43. The Reference Obligation Notional Amount is defined in Section 1 of the Confirmation.

44. Wachovia is the Fixed Rate Payer or Buyer in the Transaction.

45. CDO Plus is the Floating Rate Payer or Seller in the Transaction.

46. Wachovia's payment obligations under the Agreement are defined in Section 2 of the Confirmation.

- 41 -

47.     CDO Plus's payment obligations as the Floating Rate Payer are defined in Section 3 of the Confirmation.

48.     The Independent Amount is defined in Section 7 of the Confirmation.

49.     CDO Plus may be obligated to transfer collateral to Wachovia pursuant to the terms of the Agreement; specifically, paragraph 3 of the ISDA Credit Support Annex.

50.     Paragraph 3 of the ISDA Credit Support Annex specifies the amount of collateral to be posted under the Agreement.

51.     The Credit Support Amount is defined in Paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex.

52.     The Delivery Amount is defined in Paragraph 3 of the ISDA Credit Support Annex.

53.     The Return Amount is defined in Paragraph 3 of the ISDA Credit Support Annex.

54.     Wachovia is the Secured Party as defined by the Agreement.

55.     CDO Plus is the Pledgor as defined by the Agreement.

56.     Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Secured Party may demand Transfers of Eligible Credit Support.

57.     Pursuant to Paragraph 3 of the ISDA Credit Support Annex a Pledgor may demand Return Amounts.

58.     Throughout the term of the Agreement, the Pledgor never made a demand for a Return Amount, as defined by Paragraph 3(b) of the ISDA Credit Support Annex.

59.     Under the terms of the Agreement Wachovia is the Valuation Agent.

60.     Pursuant to Paragraph 4(c) of the ISDA Credit Support Annex, the Valuation Agent determines Exposure and Value as defined by the ISDA Credit Support Annex.

61.    Under the terms of the Agreement, the Calculation Agent does not determine either Exposure or Value.

62.    Under the terms of the Agreement, the Calculation Agent does not determine the Credit Support Amount.

63.    Pursuant to paragraph 13(c)(ii) of the ISDA Credit Support Annex, Wachovia was entitled to mark the position on a daily basis.

64.    Paragraph 5 of the ISDA Credit Support Annex sets forth the obligations of the Parties if either party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount.

### CDO Plus's Failure to Post Collateral

65.    Between May and November 2007, the market for CDOs declined.

66.    As the market for CDOs declined, so too did the market for credit protection tied to CDOs.

67.    Because the market value of CDO Plus's position in this transaction (as a credit protection seller) declined, Wachovia was entitled to require additional collateral from CDO Plus as security against CDO Plus's payment obligations under the contract.

68.    The declining market value for derivative swap transactions tied to CDOs reflected the fact that investors were no longer willing to make investments at terms similar to the Transaction entered into by CDO Plus.

69.    Paragraph 3 of the ISDA Credit Support Annex sets forth the terms and conditions under which Plaintiff may be obligated to provide Wachovia with collateral support for Plaintiff's obligations under the Agreement.

70.    Under the terms of Paragraph 3, Wachovia is entitled to demand collateral transfers from CDO Plus ("Notice of Collateral Demand" or "Collateral Call") when the Credit Support Amount exceeds the Value of all Posted Credit Support by $250,000.00.

71.    As the Valuation Agent, Wachovia was obligated to calculate Exposure.

72.    Exposure is defined in paragraph 12 of the ISDA Credit Support Annex.

73.    Wachovia, as Valuation Agent, calculated Exposure pursuant to the ISDA Credit Support Annex definition on a mark-to-market basis throughout the term of the Agreement.

74.    Calculating Exposure in a credit derivative swap transaction on a mark-to-market basis is required under the Agreement.

75.    Wachovia never calculated Exposure based upon the creditworthiness of CDO Plus.

76.    Pursuant to paragraph 3 and 13(b)(i)(C) of the ISDA Credit Support Annex, Wachovia used its calculation of Exposure to determine the Credit Support Amount.

77.    When the Credit Support Amount exceeded the Value of all Posted Credit Support (the amount of collateral Wachovia was holding on behalf of CDO Plus) by $250,000.00, Wachovia provided CDO Plus with a Notice of Collateral Demand, which stated the additional amount of collateral that CDO Plus was required to deposit with Wachovia.

78.    Beginning in the summer of 2007, CDO Plus began to object to Wachovia's Collateral Calls.  Specifically, CDO Plus objected to Wachovia's calculation of Exposure.

79.    CDO Plus understood Wachovia's Collateral Calls to be demands for Transfers of Eligible Credit Support, and not demands for payments of Floating Amounts.

80.    CDO Plus declined to invoke the Dispute Resolution provision of the Agreement for the first five months of the Transaction.

81.    Wachovia's calculations of Exposure were commercially reasonable.

CDO PLUS BREACHES THE AGREEMENT

82.    On November 21, 2007, Wachovia determined that the Credit Support Amount exceeded CDO Plus's Posted Credit Support by $550,000.00.  Wachovia then sent CDO Plus a Notice of Collateral Demand requesting that CDO Plus deposit with Wachovia the outstanding collateral amount.

83.    CDO Plus refused to transfer the additional collateral and, in a letter dated November 21, 2007, invoked the Dispute Resolution provision of the Agreement.

84.    Because Wachovia's Collateral Calls are generated automatically, Wachovia continued to issue a Collateral Call every business day that CDO Plus failed to transfer the additional collateral due under the Agreement.

85.    Under the terms of the Dispute Resolution provision of the Agreement, if a party disputes the Valuation Agent's calculation of the Delivery Amount or Return Amount, it may notify the counterparty and the Valuation Agent that the Valuation Agent's calculation is disputed.  The Valuation Agent then must recalculate the Exposure pursuant to the terms of paragraph 5 of the ISDA Credit Support Annex.

86.    Pursuant to the terms of this Dispute Resolution provision, on November 26, 2007, Wachovia obtained four actual quotations at mid-market from Reference Market-makers for the purposes of calculating the Market Quotation.  This valuation was the prescribed method for recalculating the Exposure pursuant to paragraph 5 of the ISDA Credit Support Annex.

87.    Based upon these quotations, Wachovia calculated the Market Quotation as 96.5 percent.

88.     A quotation of 96.5 percent of the Notional Amount, plus the Independent Amount, meant that Wachovia was entitled to hold an additional $1,490,000 from CDO Plus in collateral

89.     The Market Quotation revealed that Wachovia's November 21, 2007 determination of Exposure was below the Market Quotation.

90.     The Market Quotation established that Wachovia's November 21, 2007 determination of Exposure was commercially reasonable.

91.     On November 26, 2007, Wachovia provided CDO Plus with copies of the four quotations.

92.     On November 27, 2007, Wachovia issued a Collateral Call to CDO Plus based upon the revised valuation of Exposure.

93.     Under the terms of the Agreement, CDO Plus was required to meet the Collateral Call, by transferring to Wachovia the additional required collateral, by close of business on November 27, 2007.

94.     CDO Plus failed to transfer the additional required collateral.

95.     Instead, in an email dated November 27, 2007, CDO Plus stated:  [w]ith regard to your email and margin call that we received today, we do not consider that the dispute resolution process we recently invoked to be resolved to our satisfaction.  We are still in the process of securing our own market levels and analyzing the servicer's report.  As the process is not complete, we are not ready to conclude as to a course of action."

96.     Under the terms of the Agreement, CDO Plus was required to transfer the required collateral amount established by the Valuation Agent's revised calculation of Exposure, upon the demand made by Wachovia.

97.    CDO Plus breached the Agreement when it refused to transfer the additional collateral demanded by Wachovia on November 27, 2007.

98.    Under the terms of the Dispute Resolution provision of the Agreement, CDO Plus was not entitled to "seek [its] own market levels" as an alternative to the Valuation Agent's revised calculation; however, in an effort to remedy CDO Plus's breach of the Agreement, on November 27, 2007, Wachovia offered to review any additional market quotes that CDO Plus had obtained through its independent research.

99.    Wachovia requested that CDO Plus provide Wachovia with any additional market quotes by no later than 12 p.m., on Wednesday November 28, 2007.

100.    Despite Wachovia's efforts to remedy CDO Plus's breach of the Agreement, CDO Plus did not provide Wachovia with any additional market quotes.

101.    Indeed, rather than provide Wachovia with any objective evidence that the Valuation Agent's revised calculation was incorrect, CDO Plus filed the Complaint in this action.

102.    Upon information and belief, CDO Plus never obtained any additional market quotes that were materially different from the quotes obtained by the Valuation Agent when it conducted the Dispute Resolution procedure.

103.    CDO Plus's lawsuit against Wachovia constituted an Event of Default under the Agreement.

104.    On December 7, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Failure to Transfer.  The Notice demanded that CDO Plus transfer the additional collateral due under the terms of the Agreement.

105.    CDO Plus again refused to transfer the additional required collateral.

106.    On December 10, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Events of Default, which outlined the basis for CDO Plus's default on the Agreement.

107.    Under the terms of the Agreement, CDO Plus's default gave rise to an Event of Default, which gave Wachovia the right to cause an early termination of the Agreement.

108.    On December 13, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Early Termination for Event of Default.  In that Notice, Wachovia designated December 18, 2007 as the Early Termination Date.

109.    On the Early Termination Date, Wachovia calculated the amount due and payable by CDO Plus, pursuant to the terms of the Agreement.

110.    On December 20, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with a formal Notice of Amount Due Following Early Termination.

111.    Based upon Wachovia's calculation, which was made in accordance with the terms of the Agreement, the amount due and payable to Wachovia was $9,999,000.00.

112.    Pursuant to the terms of the Agreement, CDO Plus was required to pay Wachovia $9,999,000.00, plus interest from the Early Termination Date.

113.    CDO Plus refused to pay the amount due as a result of the Early Termination of the Agreement.

114.    On December 27, 2007, Wachovia exercised its right to liquidate CDO Plus's Posted Collateral Amount (which was the sum of the Collateral Transferred to Wachovia, $8,920,000.00, plus Interest Amounts, $61,290.34) and apply the proceeds against the Settlement Amount due as a result of the Early Termination of the Agreement.

115.    The liquidation proceeds due and payable to Wachovia were $8,968,138.88 (which was the difference of the Posted Collateral Amount, $8,981,290.34, and interest due and payable to Wachovia at the Default Rate, $13,151.46).  Pursuant to paragraph 8 of the ISDA Credit Support Annex, Wachovia exercised its right to apply the proceeds against the Settlement Amount, $9,999,000.00.  After liquidation of the Posted Collateral against the Settlement Amount, Wachovia is still owed $1,030,861.12 (which was the difference of $9,999,000.00 and $8,968,138.88).

116.    On December 27, 2007, pursuant to the terms of the Agreement, Wachovia provided CDO Plus with formal Notice of Amount Due Following Application of Collateral, and requested that CDO Plus make immediate payment of the remaining unpaid Settlement Amount, which was $1,030,861.12.

117.    The December 27, 2007 letter also placed CDO Plus on notice of its obligation, pursuant to paragraph 11 of the ISDA Credit Support Annex, to indemnify and hold harmless Wachovia for and against all reasonable out-of-pocket expenses, including legal fees incurred by Wachovia by reason of enforcement and protection of its rights under the Agreement.

118.    CDO Plus refused to pay the remaining unpaid Settlement Amount.

119.    CDO Plus also refused to meet its indemnity obligations under the Agreement.

120.    On January 30, 2008, the Reference Obligation experienced an Event of Default.

121.    On February 8, 2008, Moody's downgraded the Reference Obligation to "Ca".

## FIRST CAUSE OF ACTION
### (Breach of Contract)

122.    Plaintiff repeats and realleges the allegations contained above, as if fully set forth herein.

123.    Wachovia and CDO Plus entered into the Agreement in May 2007.

124.   Wachovia performed all of its obligations under the Agreement.

125.   At all times, Wachovia acted in good faith and in a commercially reasonable manner.

126.   CDO Plus breached the Agreement by, among other things:  (1) refusing to transfer the Eligible Credit Support required under the Agreement; (2) refusing to pay the amount due following the Early Termination Event; (3) refusing to pay the remaining unpaid Settlement Amount, with interest thereon; and (4) refusing to indemnify Wachovia pursuant to the terms of the Agreement.

127.   In addition, filing the Complaint in this action constituted an Event of Default pursuant to Section 5 of the ISDA Master.

128.   As a result of CDO Plus's breach of the Contract, Wachovia has been damaged in an amount to be determined at trial.

## RESERVATION OF RIGHTS AND NON-WAIVER

Wachovia reserves the right to amend this Answer and Counterclaims and to assert such other and additional claims and defenses that are warranted by disclosure or by discovery in this matter.

WHEREFORE, Wachovia respectfully requests that the Court enter a judgment:

(i)     awarding Wachovia $1,030,861.12, with interest thereon, plus prejudgment interest;

(ii)    awarding Wachovia all costs associated with collection of amounts due under the Agreement, including, but not limited to, attorneys' fees; and

(iii)   such other and further relief as the Court may deem proper.


Date:  New York, New York
       February 15, 2008

                          HUNTON & WILLIAMS LLP

                          By:  /s/ Shawn Patrick Regan
                               Shawn Patrick Regan
                               200 Park Avenue, 52nd Floor
                               New York, New York  10166
                               (212) 309-1000
                               sregan@hunton.com

                               -and-

                               Patrick L. Robson
                               HUNTON & WILLIAMS LLP
                               Bank of America Plaza
                               101 S. Tyson Street, Suite 3500
                               Charlotte, North Carolina  28280
                               (704) 378-4700
                               probson@hunton.com

                               *Attorneys for Defendant*
                               *Wachovia Bank, National Association*

## DECLARATION OF SERVICE

Raymond E. Galbraith, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that:

I am a Litigation Paralegal at the law firm of Hunton & Williams LLP, attorneys for Defendant Wachovia Bank, National Association.

That on February 15, 2008, I served a true copy of the attached Answer and Counterclaim on counsel of record listed below via the Court's ECF System.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 15, 2008.

/s/ Raymond E. Galbraith
Raymond E. Galbraith

TO:    Terence W. McCormick, Esq.
Steven Glen Mintz, Esq.
Mintz & Gold LLP
470 Park Avenue South
10th Floor
New York, NY  10016-6819

*Attorneys for Plaintiff*
*CDO Plus Master Fund Ltd.*

# Exhibit 3

# FINRA DISPUTE RESOLUTION

| | |
|---|---|
| VCG SPECIAL OPPORTUNITIES MASTER FUND LTD. f/k/a CDO PLUS MASTER FUND LTD. **Claimant,** v. WACHOVIA CAPITAL MARKETS, LLC **Respondent.** | FINRA Case No.: |

## STATEMENT OF CLAIM

This arbitration is brought by VCG Special Opportunities Master Fund Ltd.,

formerly known as CDO Plus Master Fund Ltd ("Claimant" or "VCG") against

Wachovia Capital Markets, LLC ("Respondent" or "Wachovia Capital") in

connection with an investment contract product sold to VCG through Wachovia

Capital on or about May 27, 2007, called a "credit default swap", resulting in almost

$10,000,000 in compensatory damages to VCG. The amount of losses may increase,

so the compensatory damages in this arbitration are currently unstated.

Wachovia Capital, a member of FINRA, is liable to VCG based on Wachovia

Capital's breach of FINRA Conduct Rules (including Rule IM-2310-2 "Fair

Dealing",[1] Rule 2300 "Commercial Honor and Just and Equitable Principles of

---

[1] FINRA Conduct Rule IM 2310-2 *Fair Dealing with Customers*: (a)(1)
Implicit in all member and registered representative relationships with customers and

Trade",[2] Rule IM-2310-3 "Suitability Obligations to Institutional Customers",[3] breach

of fiduciary duties, violations of other applicable FINRA Conduct Rules, negligence,

negligent supervision, violations of customer agreements, violations of the implied

covenant of good faith and fair dealing, fraud, constructive fraud, and any other legal

theories under federal and state law or FINRA practice that may be applicable to the

facts. Claimant seeks equitable, as well as legal, relief.[4]

---

others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with particular emphasis on the requirement to deal fairly with the public.

[2] FINRA Conduct Rule 2110. *Standards of Commercial Honor and Principles of Trade*: A member, in the conduct of its business, shall observe high standards of commercial honor and just and equitable principles of trade.

[3] FINRA Conduct Rule 2310-*3 Suitability Obligations to Institutional Customers*: .... Members are expected to meet the same high standards of competence, professionalism, and good faith regardless of the financial circumstances of the customer.... If a customer is either generally not capable of evaluating investment risk or lacks sufficient capability to evaluate the particular product, the scope of a member's customer-specific obligations under the suitability rule would not be diminished by the fact that the member was dealing with an institutional customer.

[4] The Panel may note that, for court actions, the courts are split as to whether a violation of FINRA Conduct Rues or NYSE Rules constitutes a cause of action for proceeding in court. However, the issue is clear that a claimant *in FINRA arbitration* can seek damages for violations of FINRA Conduct Rules. In the words of Linda D. Fienberg, President of the FINRA (and former NASD) Dispute Resolution:

> In SRO/NASD arbitration, unlike in court, you get an equitable result. **You do not have to have a claim that is cognizable under state or federal law; it can be cognizable under NASD rules.** So, for example, there is only one cause of action under federal securities laws, that's 10-b. It's very limited, it has a very short statute of limitations. The rules

2

In essence, Wachovia Capital engaged in unfair dealing and commercially dishonorable and inequitable trading practices by discriminating against customer VCG in favor of another customer [sister-affiliate Wachovia Bank under common control with Wachovia Capital] and failing to disclose certain inside information known by Wachovia Capital through proprietary sources that the investment contract with terms arranged by Wachovia Capital was an unfair and exceptionally risky deal for VCG. The undisclosed information [including internal analyses and mortgage data received by Wachovia Capital from proprietary sources] was information that was unknown by, and not publicly available to, Claimant VCG. By arranging the terms of this deal, and not disclosing material information, Wachovia Capital allowed and aided another customer, its sister-affiliate Wachovia Bank, to wrongfully extract (or in other words, "steal") about $10,000,000 from VCG. Claimant VCG believes that, based on the circumstantial evidence of the rapid requests by Wachovia Bank upon VCG for money under the investment contract, within weeks of the inception of the investment contract, Wachovia Capital knew before the deal closed that VCG was undertaking a substantially higher risk than the terms set by Wachovia Capital. With

---

that are applied by arbitrators looking for equitable relief are much broader than if they had to strictly follow the law.

Speech of Linda D. Fienberg, July 20, 2004, presented to North American Securities Administrators Association (NAASA) Arbitration Forum; available at www.connectlive.com/events/nasaa [39:20-40:00 min.] (emph. add.)

a 2.75% annual payment to VCG [$275,000] for putting up $10,000,000 of credit

swap, the odds of default causing payment of the $10,000,000 were supposed to be

extremely low, and should have been a conservative investment for VCG; but the

documents received during discovery in this matter should reveal that Wachovia

Capital had inside proprietary information, unknown to VCG and not publicly

available, indicating that this deal was extremely dangerous for VCG, jeopardizing a

large percentage of VCG's net worth (i.e., 40%) that Wachovia Capital knew was so

limited, to wit, Wachovia Capital knew that VCG had only $25 million in capital at

that time.

Ordinarily, brokers act on behalf of customers by making markets; and they

can, from time-to-time take a proprietary position based on their opinion of

risk/return. However, in this case, Wachovia Capital crossed over the line of fair

dealing. <u>Wachovia Capital and its sister affiliate Bank knew that they were about to</u>

<u>experience billions of dollars in losses, and were looking to predatorily "steal" from</u>

<u>other accounts, such as Claimant VCG, to unfairly "pick off" their assets</u>. Acting

with commercial dishonor, Wachovia Capital "suckered" Claimant VCG into the

swap deal, with risk and terms that Respondent knew, or should have known, were

grossly unfair and predatory vis-à-vis Claimant, for the benefit of another client... the

sister Bank.

This arbitration is brought under FINRA Code of Arbitration Procedure Rule 12200, providing that parties must arbitrate a dispute under the Code if requested by the customer, and "[t]he dispute arises in connection with the business activities of the member"; and also brought under Rule 12200 based on written arbitration clauses in any written agreements between the parties. During the period at issue, VCG was a customer of Wachovia Capital through written and oral agreements and a course of business dealings, as well as through VCG's investment advisor, Vanquish Advisors LLC, formerly known as Rekon Advisors LLC. The dispute arises in connection with the business activities of Wachovia Capital. The customer relationship between VCG and Wachovia Capital was extensive, and caused VCG to trust Wachovia Capital. As a customer, VCG, through its agents, was in almost constant contact with Wachovia Capital by telephone and Bloomberg emails about potential deals, such as offers by Wachovia Capital to sell to customer VCG the equity and debt from collateralized debt obligations, and offers to sell to customer VCG debt from mortgage backed securities. Some of the Wachovia Capital agents with whom VCG did business were William McAndrews, Scott Williams, Sergie Zagin, Tom Edwards, Tom Wickwire and Michael Thompson. Moreover, VCG, through its agents, have purchased securities as a customer from Wachovia Capital previously.

Venue is proper in Boca Raton, Florida, which is the nearest FINRA hearing location to Claimant VCG's principal place of business in the United States, located in Delray Beach, Florida, during the misconduct of Wachovia Capital at issue; and all

5

communications with VCG's agents about the swap were transmitted to and from Delray Beach, Florida.[5]

Claimant VCG is a relatively tiny private investment company that, at the time of the May 27, 2007 transaction had only eight investors and assets of about $25 million, with relatively conservative investments.[6] VCG trusted Wachovia Capital as a fiduciary, and expected even-handed and fair treatment as a customer.

In the course of its business communications and dealings with Wachovia Capital, VCG and its agents inquired about a credit default swap with Wachovia Capital of an underlying debt instrument (called the "reference obligation"), concerning a possible candidate (called a "name") of Senior Notes of Forge ABS High Grade CDO Ltd. 2007-1A ("Forge"), a collateralized debt obligation ("CDO"). This was intended to be a conservative, relatively safe, investment for VCG, one that would produce an investment return commensurate with the risk.. After a period of evaluation, Wachovia Capital contacted Claimant VCG with its recommendation to go forward with such a credit default swap, *with Wachovia Capital setting the terms* consisting of a 2.75% annual fee calculated on $10,000,000 of Forge, and VCG

---

[5] VCG is incorporated under the laws of the Isle of Jersey, Channel Isles.

[6] In a general non-legal parlance, VCG may be known as a tiny and relatively conservative/balanced hedge fund, since it is not regulated as a public mutual fund company. Just as there are conservative/balanced mutual funds, there exist conservative/balanced private investment companies.

6

required to place $750,000 as "initial margin",[7] to secure the obligation; and in return,

VCG agreed to pay Citibank only upon the occurrence of a credit event.[8]. Of

significance, under such an investment contract, neither of the swap's counterparties

(i.e., the parties buying and selling the credit default risk) necessarily holds the Forge

debt instrument on which the swap is based, so it is _not_ insurance against losses on

the reference obligation suffered by one of the counterparties.    Also of significance,

VCG thought that Wachovia Capital was going to engage in the investment contract

as a principal, but at the last moment brought in another of its customers instead, to

wit, sister-affiliate Wachovia Bank, under common control. Whether Wachovia

Capital was going to act as a principal, or as agent for another customer did not

matter, since the obligations of full disclosure, fair dealing, and commercial honor

continued _vis-à-vis_ VCG as a customer. Prior to the last-minute change, all dealings

by VCG and its agents were with Wachovia Capital, which set the terms of the deal,

---

[7] Wachovia Capital wanted $1.5 million as the initial margin, but when VCG was prepared to walk away from the deal, Wachovia Capital lowered it to $750,000. Almost immediately after the deal occurred, excuses were made by Wachovia Bank, to which Wachovia Capital had assigned the deal, to force VCG to raise the initial margin to $1.5 million, "coincidentally" to the amount originally rejected by VCG. It was only later, perhaps by early July, that VCG began to realize that something was terribly wrong.

[8] Under the ISDA standard terms that govern the investment contract, a credit event is defined as a "Writedown, Failure to Pay Principal or an Interest Shortfall",

and therefore "recommended" it, according to the industry standards and compliance manuals.[9]

Wachovia Capital states on the Internet that it gives "Uncommon Ideas for Uncommon Challenges", publicly touting its "capital solutions" and "experienced advice". VCG trusted Wachovia Capital as a fiduciary, and expected fair dealing, equitable trading, honesty, and full disclosure, but Wachovia Capital violated its obligations.

Within weeks of the May 27, 2007 commencement of the swap, Wachovia Bank made more and more demands for margin based on its view of the fair value of the swap contract, eventually demanding and receiving almost $10 million from VCG by November 2007. The post-closing rapid demands for money by Wachovia Bank, the ultimate counterparty to the swap brought in by Wachovia Capital, is circumstantial evidence that Wachovia Capital, which set up the terms of the swap, had inside information *before* the deal was consummated, that VCG was unfairly undertaking a much higher risk than VCG was led to believe.

The post-closing demands for money by Wachovia Bank is currently the subject of litigation in New York.[10] In contrast, the claim in this arbitration is against

---

[9] It is industry standard, and in virtually every compliance manual, that a favorable comment by a broker to a security or an investment renders it a "recommendation" by the broker on the purchase.

[10] Whether there is some overlap in the damages sought in the New York litigation against a bank and this arbitration against a broker-FINRA Member, is a matter to be determined, and could depend upon the ultimate theory of liability in any

Wachovia Capital, *not* a party to the New York litigation, based on its unique obligations as a FINRA member, and other legal duties owed to its customer, to be decided by a panel of FINRA arbitrators. Wachovia Capital, the FINRA member that was setting the terms for the swap, had obligations to disclose information to its customer VCG instead of concealing critical information and discriminating in favor of another customer that happened to be its sister-affiliate under the same corporate holding company.

### Discovery of Documents is This Unusual Arbitration Will Go Way Beyond the Discovery Guide

This is not the typical customer case that the Panel members are accustomed to seeing, where the FINRA Discovery Guide may cover most of the areas of discovery. Instead, it comes within the ambit of the prefatory language of the Discovery Guide saying that it "serves as a guide", and "it is not intended to remove flexibility from arbitrators or parties in a given case. Arbitrators can order the production of documents not provided for by the Document Production Lists...." Well, this is such a "given case" if ever the Panel will see one, requiring very specific document requests to ferret-out the truth about the concealment of critical information that should have been disclosed to customer VCG, which would have caused this investment contract never to occur, instead of Wachovia Capital arranging for its

Panel Award. If Wachovia Bank contends in the litigation that an Award from this Panel somehow affects the amount of damages sought in the litigation (which will likely go to trial months or years after this arbitration's final hearing) it is a matter for a court, and should not concern this Panel.

9

sister-affiliate Wachovia Bank to essentially "steal" about $10,000,000 from the tiny investment company and its eight investors.

Areas of inquiry for document requests will include these types of parameters:

1.    What inside information did Wachovia Capital have about the mortgage problems with the thousands of mortgages in the Forge reference obligation, so that Wachovia Capital, and its sister-affiliate, knew that actual and potential defaults in the underlying collateral would cause a rapid extraction of the $10,000,000 from VCG?

2.    What inside information (such as internal analyses or computer models) did Wachovia Capital have about the impending meltdown in the credit/mortgage markets so that it or its sister-affiliate would use the tiny investment company as a "patsy" to extract millions of dollars?

3.    What communications occurred between Wachovia Capital and its customer Wachovia Bank (including emails) to exchange information about the swap, and the impending mortgage meltdown, and about the pricing and counterparty risks (including "low level information" about the mortgages involved) which information should have been disclosed to VCG as a customer of Wachovia Capital?

4.    What did Wachovia Capital know about a "ratings migration", to wit, the impending downgrade in ratings of the mortgages or derivatives underlying Forge, and similar "ratings migrations", that should have been disclosed?

5.    Essentially, in Nixonian terms, what did Wachovia Capital know, and when did it know it?

The Panel will be asked to order broad discovery into these topics if Wachovia Capital refuses to cooperate.

## Punitive Damages

If, as Claimant VCG expects, the evidence from the documents reveals that Wachovia Capital concealed material information from VCG either through gross negligence or worse, punitive damages of at least three or four times compensatory damages should be assessed against Respondent Wachovia Capital.

## Conclusion

Claimant VCG asks that the Panel issue an Award in its favor of compensatory damages in an amount to be proven, punitive damages in an amount at least three or four times compensatory damages, the costs of this arbitration, and such other and further relief as the Panel deems appropriate.

Richard A. Stephens
Law Office of Richard A. Stephens
7700 Congress Avenue, Suite 1109
Boca Raton, FL 33487
Florida Bar No. 977055
Tel.:   (561) 981-8180
Fax:   (561) 981-8153
bocalawyer@aol.com
Counsel for Claimant

Address and phone from May 30, 2008
through October 10, 2008, as follows:

1514 Beech Mountain Parkway
Beech Mountain, NC 28604
Tel (828) 387-2251
Fax (828) 387-9391

Dated: May 1, 2008

**N.A.**                                                                 **N.A.**
_____          _____
Name of Registered Representatives                     Account Numbers


## III.  RELIEF REQUESTED

1.  Damages

Actual Damages Requested                    Unknown at this time but greater than
                                            $50,000
(monetary sum required to compensate a party for his or her loss)    _____


Punitive Damages Requested
(monetary amount intended to punish the wrongdoer)    At least three times compensatory damages
                                                      _____

                      * AMOUNT IN DISPUTE:    Unknown but subject to damage study
                                              _____

                      *Use this amount to calculate the correct filing fee and hearing session
                      deposit in Part IV. This amount *must* match the amount stated in your
                      claim.

Interest
(include calculations, if possible) **To be calculated in damage study**


2.  Other Type of Relief Requested

**Referral to FINRA Enforcement for disciplinary action.**


3.  Costs

(Provide specific amounts, if known. If not known, please mark an "X" to indicate the costs you are requesting)
     **X**
_____
Forum Fees


_____
Attorney's Fees
     **X**
_____
Witness and Production Fees
     **X**
_____
Other Case-Related Costs


3

FINRA Arbitration
UNIFORM SUBMISSION AGREEMENT

Claimant(s)

In the Matter of the Arbitration Between

Name(s) of Claimant(s)
*VCG Special Opportunities Master Fund Limited f/k/a CDO Plus Master Fund Ltd.*

and

Name(s) of Respondent(s)
*Wachovia Capital Markets, LLC*

1. The undersigned parties hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, cross claims and all related counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

2. The undersigned parties hereby state that they have read the procedures and rules of the sponsoring organization relating to arbitration.

3. The undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s). The undersigned parties further agree and understand that the arbitration will be conducted in accordance with the Constitution, By-Laws, Rules, Regulations, and/or *Code of Arbitration Procedure* of the sponsoring organization.

4. The undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

*VCG Special Opportunities Master Fund Limited f/k/a CDO Plus Master Fund Ltd.*
_____
Claimant Name (please print)

by:

_____    *Director*          4/23/2008
Claimant's Signature                                 Date

_____
Claimant Name (please print)

_____                         _____
Claimant's Signature                                 Date

If needed, copy this page.

21